**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x
:
:
:
THE NEW YORK BANKERS ASSOCIATION,             :
INC.,                                         :
:
Plaintiff,           :
:
v.                        :    DOCKET NO. 15-CV-4001 (KPF)
:
THE CITY OF NEW YORK, THE NEW YORK            :
DEPARTMENT OF FINANCE, and THE                :
COMMUNITY INVESTMENT ADVISORY                 :
BOARD,                                        :
:
Defendants.          :
:
------------------------------------------------------------------- x

**THE NEW YORK BANKERS ASSOCIATION, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY**
**JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

H. Rodgin Cohen
Robert J. Giuffra, Jr.
Marc R. Trevino
Matthew A. Schwartz
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
*Attorneys for Plaintiff*
*The New York Bankers Association, Inc.*

June 18, 2015

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .................................................................................................5

    A.    The RBA's Enactment ...................................................... 5

    B.    The RBA's Statutory Requirements ................................... 7

    C.    The CIAB Acts To Enforce the RBA ................................. 9

LEGAL STANDARD .........................................................................................11

ARGUMENT ....................................................................................................12

I.    THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO NYBA ON
ITS CLAIMS THAT THE RBA IS PREEMPTED BY FEDERAL AND
STATE LAW AND ISSUE A PERMANENT INJUNCTION .................................. 13

    A.    The RBA Is a Regulatory—Not Proprietary—Municipal Law ........... 13

    B.    The RBA Is Preempted by Federal Law ............................... 16

        1.    In Direct Conflict with Federal Banking Law, the RBA Purports
To Grant the CIAB Visitorial Powers Over National Banks ................. 16

        2.    In Direct Conflict with Federal Banking Law, the RBA Seeks To
Regulate Lending and Other Core Banking Activities ........................ 18

        3.    In Direct Conflict with Federal Banking Law, the RBA Restrikes
the Federal CRA's Carefully Struck Balance with Respect to
Regulating Community Reinvestment ...................................... 20

    C.    New York State Banking Law Preempts the RBA .......................... 23

    D.    The RBA's Use of Supposedly "Indirect" Means of Achieving the City's
Regulatory Objective Does Not Save this Unconstitutional Law ............ 24

*Page*

**II.**   **IN THE ALTERNATIVE, THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION UNTIL IT CAN RULE ON THE MERITS OF NYBA'S CLAIMS** ................................................................ 25

   A.   NYBA Members Face Imminent Irreparable Harm ............................................. 26

   B.   The Public Interest and Balance of Equities Favor a Preliminary Injunction ....... 30

**CONCLUSION** ..................................................................................................... 31

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Albany Area Builders Ass'n* v. *Town of Guilderland*,
  74 N.Y.2d 372 (1989) ...................................................................................................23

*Allied Const. Indus.* v. *City of Cincinnati*,
  2014 WL 2931421 (S.D. Ohio June 30, 2014) .....................................................30

*Am. Fin. Servs. Ass'n* v. *Burke*,
  169 F. Supp. 2d 62 (D. Conn. 2001)...................................................................28

*Am. Trucking Ass'n* v. *City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ....................................................................28, 29

*Arizona* v. *U.S.*,
  132 S. Ct. 2492 (2012).......................................................................................12

*Barnett Bank, N.A.* v. *Nelson*,
  517 U.S. 25 (1996)......................................................................................16, 18

*Bldg. & Constr. Trades Council* v. *Assoc. Builders & Contractors of Mass./R.I., Inc.*,
  507 U.S. 218 (1993)...........................................................................................13

*Bldg. Indus. Elect. Contrs. Ass'n* v. *City of N.Y.*,
  678 F.3d 184 (2d Cir. 2012).............................................................................14

*Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*,
  462 F.3d 219 (2d Cir. 2006)..............................................................................12

*Chamber of Commerce* v. *Brown*,
  554 U.S. 60 (2008)....................................................................................... 13-14

*Chamber of Commerce* v. *Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ..................................................................... 27-28

*Chamber of Commerce* v. *Reich*,
  57 F.3d 1099 (D.C. Cir. 1995).............................................................................25

*Citizens United* v. *FEC,*
    558 U.S. 310 (2010)...................................................................................12

*Clearing House Ass'n, LLC* v. *Spitzer,*
    394 F. Supp. 2d 620 (S.D.N.Y. 2005)........................................................27

*Crosby* v. *Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)...................................................................................19

*Cuomo* v. *Clearing House Ass'n, LLC,*
    557 U.S. 519 (2009) ..................................................................................17

*Entergy Nuclear Vt. Yankee, LLC* v. *Shumlin,*
    733 F.3d 393 (2d Cir. 2013)......................................................................12

*Fid. Fed. Sav. & Loan Ass'n* v. *de La Cuesta,*
    458 U.S. 141 (1982)...................................................................................16

*Fireman's Fund Ins. Co.* v. *City of Lodi,*
    302 F.3d 928 (9th Cir. 2002) ......................................................................4

*First Union Nat'l Bank* v. *Burke,*
    48 F. Supp. 2d 132 (D. Conn. 1999)..........................................................26

*Friends of the Earth, Inc.* v. *Laidlaw Env'tl Servs., Inc.*
    528 U.S. 167 (2000).....................................................................................8

*Gen. Elec. Co.* v. *Callahan,*
    294 F.2d 60 (1st Cir. 1961) .......................................................................24

*Glenwood Bridge* v. *City of Minneapolis,*
    940 F.2d 367 (8th Cir. 1991) .....................................................................30

*Gully* v. *NCUA Bd.,*
    341 F.3d 155 (2d Cir. 2003).......................................................................29

*Healthcare Ass'n of N.Y.* v. *Pataki,*
    471 F.3d 87 (2d Cir. 2006)....................................................................13, 15

*Hedges* v. *Obama,*
    724 F.3d 170 (2d Cir. 2013).......................................................................11

*Joint Anti-Fascist Refugee Comm.* v. *McGrath*,
   341 U.S. 123 (1951) ........................................................................29

*Lansdown Entm't Corp.* v. *N.Y.C. Dep't of Consumer Affairs*,
   74 N.Y.2d 761 (1989) .....................................................................24

*Matter of Council of N.Y.* v. *Bloomberg*,
   6 N.Y.3d 380 (2006) .......................................................................14

*Mayor of N.Y.* v. *Council of City of N.Y.*,
   6 Misc. 3d 533 (N.Y. Sup. Ct. 2004) ............................................23

*Mayor of N.Y.* v. *Council of N.Y.*,
   4 Misc. 3d 151 (N.Y. Sup. Ct. 2004) ................................... *passim*

*Metro. Taxicab Bd. of Trade* v. *City of N.Y.*,
   2008 WL 4866021 (S.D.N.Y. Oct. 31, 2008) ...............................16

*Metro. Taxicab Bd. of Trade* v. *City of N.Y.*,
   633 F. Supp. 2d 83 (S.D.N.Y. 2009) .........................................25-26

*Mich. Bldg. & Constr. Trades Council* v. *Snyder*,
   846 F. Supp. 2d 766 (E.D. Mich. 2012) .......................................15

*Mitchell* v. *Cuomo*,
   748 F.2d 804 (2d Cir. 1984) ..........................................................27

*Mullins* v. *City of N.Y.*,
   626 F.3d 47 (2d Cir. 2010) ............................................................26

*Morales* v. *Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ........................................................................30

*N.Y. News, Inc.* v. *N.Y.*,
   745 F. Supp. 165 (S.D.N.Y. 1990) ...........................................24-25

*N.Y. Progress & Protection PAC* v. *Walsh*,
   733 F.3d 483 (2d Cir. 2013) .......................................................25-26

*Nat'l City Bank of Ind.* v. *Boutris*,
   2003 WL 21536818 (E.D. Cal. July 2, 2003) ...............................26

*Nat'l City Bank* v. *Turnbaugh*,
    367 F. Supp. 2d 805 (D. Md. 2005) ....................................................................30

*Nat'l Elevator Cab & Door Corp.* v. *H&B, Inc.*,
    282 F. App'x 885 (2d Cir. 2008) ................................................................. 28-29

*Nat'l Foreign Trade Council* v. *Natsios*,
    181 F.3d 38 (1st Cir. 1999).............................................................................15

*Nat'l Treasury Emps. Union* v. *Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006) ...................................................................25, 30

*Odebrecht Constr.* v. *Sec'y, Fla. Dep't of Trans.*,
    715 F.3d 1268 (11th Cir. 2013) .......................................................................30

*Pac. Capital Bank, N.A.* v. *Conn.*,
    542 F.3d 341 (2d Cir. 2008).............................................................................11

*Patriot, Inc.* v. *U.S. HUD*,
    963 F. Supp. 1 (D. D.C. 1997) ........................................................................29

*Prof'l Towing & Recovery Operators of Ill.* v. *Box*,
    2008 WL 5211192 (N.D. Ill. Dec. 11, 2008) ...................................................30

*Register.com, Inc.* v. *Verio*,
    126 F. Supp. 2d 238 (S.D.N.Y. 2000)..............................................................29

*Skilled Craftsmen of Tex., Inc.* v. *Tex. Workers' Comp. Comm'n*,
    158 S.W.3d 89 (Tex. App. 2005) .....................................................................24

*Sunrise Check Cashing & Payroll Servs., Inc.* v. *Hempstead*,
    91 A.D.3d 126 (2d Dep't 2011) ................................................................. 23-24

*Susan B. Anthony List* v. *Driehaus*,
    134 S. Ct. 2334 (2014) ....................................................................................29

*Tom Doherty Assocs.* v. *Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995)................................................................................28

*Trans World Airlines, Inc.* v. *Mattox*,
    897 F.2d 773 (5th Cir. 1990) ..................................................................... 26-27

*Tucker Anthony Realty Corp.* v. *Schlesinger*,
    888 F.2d 969 (2d Cir. 1989)..................................................................12

*U.S.* v. *N.Y.*,
    708 F.2d 92 (2d Cir. 1983)....................................................................27

*U.S.* v. *Rybicki*,
    354 F.3d 124 (2d Cir. 2003)..................................................................12

*Valle Del Sol Inc.* v. *Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ..............................................................30

*Wachovia Bank, N.A.* v. *Burke*,
    414 F.3d 305 (2d Cir. 2005)................................................... 12-13, 28

*Wash. State Grange* v. *Wash. State Repub. Party*,
    552 U.S. 442 (2008)...............................................................................12

*Watters* v. *Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)...........................................................2, 16, 17, 19

*Wells Fargo Bank, N.A.* v. *Boutris*,
    252 F. Supp. 2d 1065 (E.D. Cal. 2003)........................................ 26-27

*Wells Fargo Bank, N.A.* v. *Boutris*,
    265 F. Supp. 2d 1162 (E.D. Cal. 2003)...............................................28

*Winter* v. *NRDC, Inc.*,
    129 S. Ct. 365 (2008)............................................................................12

*Wis. Dep't of Indus., Labor & Human Relations* v. *Gould, Inc.*,
    475 U.S. 282 (1986)...............................................................13, 14, 24

**Statutes**

The Civil Rights Act of 1871
    42 U.S.C. § 1983....................................................................................28

The Community Reinvestment Act, 12 U.S.C. §§ 2901 *et seq.* ........................................... *passim*
    12 U.S.C. § 2901....................................................................................20
    12 U.S.C. § 2902....................................................................................22
    12 U.S.C. § 2903....................................................................................22

The National Bank Act, 12 U.S.C. §§ 1 *et seq.* ................................................................. *passim*
    12 U.S.C. § 24 ...........................................................................................................18
    12 U.S.C. § 36 ...........................................................................................................18
    12 U.S.C. § 371 .........................................................................................................18
    12 U.S.C. § 484 ...........................................................................................16, 17, 27

N.Y. Banking Law § 1 *et seq.* .................................................................................. *passim*

N.Y. Gen. Mun. Law § 10 ...........................................................................................23

N.Y.C. Local Law Number 38 for the Year 2012 .............................................. *passim*

N.Y.C. Charter § 1524 .................................................................................................23

**Other Authorities**

Fed. R. Civ. P. 56 ....................................................................................................1, 11
Fed. R. Civ. P. 65 ..........................................................................................................1

Office of the Comptroller of the Currency Regulations
    12 C.F.R. § 4.32 ........................................................................................................20
    12 C.F.R. § 4.36 ........................................................................................................20
    12 C.F.R. § 5.30 ........................................................................................................18
    12 C.F.R. § 7.4000 ...............................................................................................16-17
    12 C.F.R. § 7.4002 ....................................................................................................18
    12 C.F.R. § 7.4007 ....................................................................................................18
    12 C.F.R. §§ 24.1 *et seq* ...........................................................................................18
    12 C.F.R. pts. 25 .......................................................................................................21
    12 C.F.R. pt. 30 .........................................................................................................19
    12 C.F.R. §§ 34.1 *et seq* ...........................................................................................19
    12 C.F.R. § 34.4 ........................................................................................................18
    12 C.F.R. pt. 345 .......................................................................................................21
    12 C.F.R. pt. 364 .......................................................................................................19

Community Reinvestment Act Regulations,
    Background, 60 Fed. Reg. 22156 (May 4, 1995) .....................................................21

Comptroller of the Currency, *Comptroller's Handbook: Real Estate Loans* (1998) ...................19

Office of the Comptroller of the Currency, *et al.*, *Interagency Advisory on the Confidentiality of the Supervisory Rating and other Nonpublic Supervisory Information* (Feb. 28, 2005) ....................................................................................................................20

Pursuant to Federal Rules of Civil Procedure 56(a) and 65(a), The New York Bankers Association, Inc. ("NYBA") respectfully submits this memorandum in support of its motion for (i) summary judgment and a permanent injunction, or (ii) in the alternative, an order preliminarily enjoining The City of New York ("City"), the New York Department of Finance ("Department of Finance"), and the Community Investment Advisory Board ("CIAB") (collectively, "Defendants") from enforcing the "Responsible Banking Act" ("RBA") (reproduced in full in Appendix A hereto).

## PRELIMINARY STATEMENT

Enacted in June 2012, the RBA represents the City's unconstitutional attempt to regulate the lending and other activities of those federally- and state-chartered banks that serve as depositories for the City's over $6 billion in deposits ("Deposit Banks").  This law was passed because the City Council (the "Council") wanted to "find[] ways that we could bring banks to the table" to, among other things, "start modifying [City residents' mortgage] loans."  (Ex. 1 (Nov. 23, 2010 Hr'g Tr. at 164:5-7).)[1]

Mayor Bloomberg, after determining that the law was preempted and imposed "onerous" compliance burdens, vetoed the law.  The Council, however, overrode the Mayor's veto, enacting the RBA, which requires a new City agency, the CIAB:

(i)     to collect confidential and proprietary information directly from Deposit Banks and to "publish all [such] information," except for certain business plans, § 1 subdiv. 3, 4;

(ii)    to "establish benchmarks, best practices, and recommendations" concerning a host of activities, such as offering financial products and loan foreclosures, all in an effort to regulate Deposit Banks' conduct, *id.* subdiv. 1(a);

(iii)   to examine whether Deposit Banks meet CIAB-determined "needs," such as "provid[ing] funding . . . for affordable housing and economic development

---

[1]     "Ex. _" refers to the exhibits accompanying the declaration of Matthew A. Schwartz.

projects," *id.* subdiv. 3(c), and to issue an annual report on whether Deposit Banks are meeting these "needs," *id.* subdiv. 1(b); and

(iv)     to identify publicly those Deposit Banks that do not provide requested information to the CIAB or satisfy the CIAB's "benchmarks and best practices" in its annual report after the CIAB's examination and performance "evaluation," *id.* subdiv. 1(b).

In setting up this municipal scheme for regulating Deposit Banks, the RBA clearly conflicts with the visitorial and other regulatory powers over federal and state-chartered banks, including Deposit Banks, exclusively vested in federal and New York ("State") bank regulators.

The federal government "has never permitted States [or municipalities] to license, inspect, and supervise national banks as they do state banks." *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 15 n.7 (2007). By requiring Deposit Banks to produce confidential, proprietary, and other information to the CIAB, and by threatening banks with the loss of depository status if they do not comply with the City's own "benchmarks, best practices, and recommendations," *id.* subdiv. 1(a), the RBA directly conflicts with the National Bank Act ("NBA"), 12 U.S.C. §§ 1 *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency ("OCC"). Federal law (i) vests exclusive power with the OCC to request banking records from and examine national banks and (ii) authorizes such banks to undertake certain actions without interference from State or municipal governments. In addition, the RBA conflicts with the federal Community Reinvestment Act ("Federal CRA") by empowering the CIAB to impose its own standards for regulating banks' community reinvestment and related activities.

New York State likewise does not permit municipalities to regulate State-chartered banks, because the State occupies the field of regulating such banks. New York Banking Law, §§ 1 *et seq.*, including the State Community Reinvestment Act ("State CRA"), makes the State Department of Financial Services the *exclusive* regulator of State-chartered financial institutions. *See Mayor of N.Y.* v. *Council of N.Y.*, 4 Misc. 3d 151, 160-62 (N.Y. Sup.

Ct. 2004) (striking down City "predatory lending" law, because "the Banking Law contains a comprehensive regulatory scheme which evidences the state's intent to occupy the field").

*First*, this Court should grant summary judgment to NYBA.  The RBA is a regulatory, not proprietary, law that impermissibly seeks to change the lending and other activities of Deposit Banks in ways having nothing to do with providing deposit services to the City.  Indeed, the City has conceded that the RBA is not intended to help the City obtain better pricing or deposit services from Deposit Banks.  (Ex. 3 (June 28 Fiscal Impact Statement at 2).) The RBA thus impermissibly uses the City's power as a multi-billion-dollar depositor to further the City's preferred political and regulatory goals, such as pressuring banks to be "more cooperative" in modifying loans for City residents.  (Ex. 1 (Nov. 23, 2010 Hr'g Tr. at 26:10-12).) As a regulatory law, the RBA unconstitutionally conflicts with both federal and State banking laws. *See infra* pp. 13-23.

To try to save the RBA, Defendants claim that this law is not preempted because Deposit Banks do not have to comply with it.  Under the City's theory, local governments can avoid the constitutional doctrine of preemption simply by threatening—through the clever use of statutory terms like "may" instead of "shall"—as opposed to mandating punishment of those that do not heel to their demands.  But the preemption doctrine is not such a craven watchdog:  there is nothing discretionary about the CIAB's threat of public shaming and/or depriving Deposit Banks of their valuable status as City depositories unless they comply with the CIAB's information and regulatory demands.  When one City entity (the CIAB) inspects banks' confidential records, informs the public—including bank customers and counterparties—of its findings, including of Deposit Banks' refusal to provide requested information, and then submits those findings to another City entity (the Banking Commission) with the power to take valuable

business from Deposit Banks, such banks are put to a constitutionally impermissible choice. They must either (i) submit to the City's regulation, including incurring the substantial costs of responding to the CIAB's burdensome demands and conflicting regulatory requirements, *or* (ii) risk being shamed publicly for not submitting to such regulation and risk losing valuable deposits.   Thus far, one NYBA member, Cross County Savings Bank, has withdrawn as a Deposit Bank rather than be subject to the CIAB's regulation.  (*See* Cross County Decl.).)[2]

Unless struck down, the RBA—enacted in the Nation's financial capital—will encourage "literally thousands of different local governments to impose" their own financial regulatory structures, which would create the exact type of "uncertainty" that the preemption doctrine is meant to prevent.  *Fireman's Fund Ins. Co.* v. *City of Lodi*, 302 F.3d 928, 948-49 (9th Cir. 2002).  Nothing would stop other cities in New York and elsewhere from enacting similar laws, imposing a patchwork of conflicting bank regulation in contravention of State and federal banking law.  The effect will be to undermine—not strengthen—extensive federal and State community lending requirements.

*Second*, without a pre-August 11, 2015 ruling in NYBA's favor on summary judgment, Deposit Banks will require a preliminary injunction to avoid irreparable injury from the RBA's requirement to provide an extremely broad and invasive amount of confidential and proprietary information in response to the CIAB's May 13 "introductory" letter, through its contractor, Econsult Solutions, Inc. ("Econsult").  As described more fully below, *infra* pp. 26-

---

[2]     In addition to the Schwartz Declaration, submitted herewith are declarations from NYBA member Deposit Bank representatives:   David A. Petraglia (Bank of America, N.A.); Lela Wingard Hughes (JP Morgan Chase Bank, N.A.); Rhona Landau (Citibank, N.A.); Gary Liotta (Flushing Bank); Kathleen Rizzo Young (HSBC Bank USA, N.A.); R. Patrick Quinn (New York Commercial Bank); Brian F. Doran (Popular Community Bank); Edward Pollock (TD Bank, N.A.); Robert Manuel (Wells Fargo Bank, N.A.); as well as Anthony Milone (former Deposit Bank Cross County Savings Bank).

30, NYBA members are either already spending, or will imminently need to spend, time and resources to comply with this unconstitutional law, including changing their business practices, or choose noncompliance and suffer reputational injury and risk losing their deposit status.

## BACKGROUND

### A.    The RBA's Enactment

Dissatisfied with federally- and state-chartered bank efforts to, for example, "mak[e] loans on affordable housing[,] to keep[] branches in working class neighborhoods, to provid[e] small business loans," and the like, the Council Finance Committee held a hearing on November 23, 2010 to "find[] ways that we could bring banks to the table."  (Ex. 1 (Nov. 23, 2010 Hr'g Tr. at 66:12-18, 164:5-7).)[3]  Following this hearing, on February 16, 2011, Domenic Recchia, the Chair of the Finance Committee, and other Council members, introduced Introductory No. 485 ("Intro 485").  (Ex. 5; Ex. 2 (Mar. 7, 2011 Hr'g Tr. at 13:17-18).)  They sought to use the City's power as a depositor, among other things, to make Deposit Banks "step up to the plate and help the people of the City of New York," because the "City Council is no longer going to sit back and let banks get[] millions of dollars in deposits and let the Banking Commission just sit back and do nothing."  (Id. at 7:15-25, 30:21-31:2 (Chairman Recchia).)[4]

In the spring of 2012, after an amended draft of the bill was introduced ("Intro 485-A"), the executive branches of both the City and State opposed the RBA's enactment.  City Treasurer Elaine Kloss warned that banks "are [already] regulated by federal and state authorities

---

[3]    The Council does not dispute (and readily admits) the material facts described in Background Sections A and B.  (See Ex. 4 (Council R. 56.1 Statement).)

[4]    The extensive legislative history showing that the RBA was intended to be a regulatory law that forces Deposit Banks to satisfy the City's political goals is set forth in NYBA's Local Rule 56.1 Statement ¶¶ 10-74, which is incorporated by reference hereto, and Exhibits 1 to 2 and 5 to 9 of the Schwartz Declaration.

with respect to the matters covered by [the law]." (Ex. 6 (Kloss Testimony at 2).) Ms. Kloss also stressed that the "proposed legislation [was] *much, much broader* than just looking at CRA ratings" (Ex. 2 (Mar. 7, 2011 Hr'g Tr. at 58:24-25 (emphasis added))), and that the RBA could "pose a hazard to [the City]" by barring it from using one of the "two or three banks that can handle" the City's complex finances (*id.* at 42:13, 23-24). Indeed, Wendy Takahisa, who testified on behalf of the State against the RBA, warned the bill "*would impose an additional regulatory burden on banks*" and that "[a]ll of the data and information that a bank would be required to submit under this legislation would be a *significant burden on smaller institutions*." (Ex. 7 (Takahisa Testimony at 3, 6) (emphasis added).)

Notwithstanding these objections, the Council passed the RBA on May 15, 2012. (Ex. 8 (May 15, 2012 Hr'g Tr. at 72:2-4).) On May 30, 2012, Mayor Bloomberg vetoed Intro 485-A, explaining that this law was:

> a misguided attempt to influence banks . . . by overlaying extensive existing federal and State bank regulation with *yet another layer of City regulation*. The bill extends *beyond the City's competence and legal authority* and risks reducing the number of banks who are willing or able to do business in the City.

(Ex. 9 (Mayor Veto Message at 1) (emphasis added).) Mayor Bloomberg also pointed to the "onerous" burdens arising out of the enactment, including that the CIAB will "seek mountains of data from each bank for each of the 2,168 census tracts in the City on eight broad categories ranging from charitable giving, to the maintenance of foreclosed properties, to investment in affordable housing and economic development projects in low-income communities." (*Id.*)

On June 28, 2012, the Council overrode Mayor Bloomberg's veto and enacted the RBA. (Ex. 10 (June 28, 2012 Hr'g Tr. at 99:24-100:2).) The Council passed this law even though the Fiscal Impact Statement for Intro 485-A demonstrated that the law "[would] have no

impact on City tax revenue," and would cost the City over half a million dollars to enforce in 2013 alone.  (Ex. 2 (June 28 Fiscal Impact Statement at 2).)

**B.      The RBA's Statutory Requirements**

The RBA establishes the CIAB, § 1 subdiv. 2, which must conduct a "needs assessment" every two years to "assess the credit, financial and banking services needs throughout the City with a particular emphasis on low and moderate income individuals and communities," by "considering the data and information collected" by the CIAB, *id.* subdivs. 1(a), 3.  The RBA requires the CIAB to collect data at the "census tract level" from Deposit Banks on their efforts, *inter alia*, to:

a.   address the key credit and financial services needs of small businesses;

b.   develop and offer financial services and products that are most needed by low and moderate income individuals and communities throughout the city and provide physical branches;

c.   provide funding, including construction and permanent loans and investments, for affordable housing and economic development projects in low and moderate income communities;

d.   In the case of properties acquired by foreclosure and owned by the bank, reasonably address serious material and health and safety deficiencies in the maintenance and condition of the property;

e.   conduct consumer outreach, settlement conferences, and similar actions relating to mortgage assistance and foreclosure prevention, and provide information, at the community district level to the board, relating to mortgage and foreclosure actions, including, but not limited to, total number of loans serviced and/or owned by the bank, total number of loans that are at least sixty days delinquent, total number of foreclosures commenced, total number of foreclosures prevented through loan modification, short sales, deeds in lieu of foreclosure or other mechanisms, total number of loan modifications applications, total number of loan modifications made and denied, and bank owned properties donated or sold at a discount;

f.   partner in the community development efforts of the city;

g.   positively impact on the city and its communities through activities including, but not limited to, philanthropic work and charitable giving; and

h.  plan for and articulate how the bank will respond to the credit, financial and banking services needs of the city identified by the needs assessment pursuant to paragraph a of subdivision 1 of this section, as applicable to the bank's type and size.

*Id.* subdivs. 1, 3.

Except for item (h) (each bank's "plan" for responding to the CIAB's Needs Assessment)—which a bank may designate as "confidential or proprietary"—the RBA contains no provision whatsoever for preserving the confidentiality of the information collected by the CIAB.  In fact, by its terms, the RBA provides that the CIAB "shall publish *all* information collected" (except for item (h)).  §1 subdiv. 4 (emphasis added).  Deposit Banks do not publish much of the information that the RBA requires them to disclose, some of which is highly confidential and proprietary and relevant to investors, including, for example, by census tract, the number of mortgages the bank has modified or the number of foreclosure actions it has instituted.  (Doran Dec. ¶ 11; Petraglia Decl. ¶ 11; Young Decl. ¶ 11; Landau Decl. ¶ 9; Quinn Decl. ¶ 12; Pollock Decl. ¶ 7; Hughes Decl. ¶ 10; Manuel Decl. ¶ 11.)[5]

The RBA also requires the CIAB to "establish benchmarks, best practices, and recommendations for meeting the needs identified in such needs assessment, by, among other things, considering the data and information collected" pursuant to subdivision 3.  § 1 subdiv. 1(a).  Under the RBA, the CIAB also must "specifically identify any deposit bank's failure to

---

[5]     On June 10, 2015, Ms. Kloss of the Department of Finance, now part of the de Blasio Administration, sent a letter to Deposit Banks stating that "the [CIAB] does not intend to publish on the Department of Finance website any confidential or proprietary information that it may receive" in response to its May 13 Letter.  (Ex. 11 (June 10 Letter).)  This representation—which contradicts the clear requirements of the RBA's text—is conspicuously not binding on the CIAB, and says nothing about the CIAB's ability to disclose confidential or proprietary information in places other than its website.  *See also Friends of the Earth, Inc.* v. *Laidlaw Env'tl Servs., Inc.*, 528 U.S. 167, 190 (2000) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways.").

provide [the] information requested," which the CIAB is required to publish on the Department of Finance's public website. *Id.* subdiv. 1(b), 4. The CIAB must publish an annual report and "transmit[] [it] to the banking commission" for "consider[ation] by the banking commission in reviewing a bank's application for designation or redesignation as a deposit bank." *Id.* subdiv. 1(b). The report must include (i) "an *evaluation of how each bank performed relative to the benchmarks and best practices* applicable to such bank as established by the [CIAB]" and (ii) identify "areas of improvement from past evaluations," *id.*—quintessentially regulatory activities.

### C.    The CIAB Acts To Enforce the RBA.

In September 2014, the City hired Econsult to implement the RBA. (Ex. 12 (Jan. 13, 2015 Hr'g Tr. at 7:24-25).) On December 18, 2014, Ms. Kloss—the City Treasurer, who, along with two CIAB members (Peter Hatch and Brian Cook), comprise the three-member Banking Commission (Ex. 13 (NYC Banking Commission May 12, 2015 Minutes)), which decides which banks can be designated as City depositories—notified the City's Deposit Banks that "[i]n the coming weeks [Econsult's subcontractor] will contact [banks] to request bank data in connection with the [the RBA]" and "[t]hank[ed] [them] in advance for [their] cooperation." (Ex. 14 (Dec. 18 Letter).)[6] Ms. Kloss stated that the forthcoming annual report would "detail[] each Designated Bank's performance in meeting the needs identified in the biennial assessment report." (*Id.*) The City thus expressly tied Deposit Banks' continued status as depositories to their "cooperation" with the CIAB and its vendor.

The CIAB held its first public hearing on January 13, 2015, by which point its eight members had all been appointed. (*See generally* Ex. 12 (Jan. 13, 2015 Hr'g Tr.).) The

---

[6]    The City has also hired at least two employees to implement the RBA (Ex. 12 (Jan. 13 Hr'g Tr. at 8:13-16)), at a cost of $140,000 (Ex. 15 (DFS FY 2015 Budget)).

CIAB then held public hearings in each Borough, beginning on February 9 and ending on February 18, which have confirmed that the RBA regulates banks. The CIAB used the information it gathered through these public hearings to help prepare its Needs Assessment, which was previewed at a public hearing held on April 1, 2015. At this hearing, the CIAB confirmed that it will use the Needs Assessment as a baseline to look at "how [] the individual designated banks [are] doing relative to the citywide averages, relative to the needs that have been expressed in the assessment." (Ex. 16 (Needs Assessment Hr'g Tr. at 25:9-12).)

The CIAB's Needs Assessment was published on April 30, 2015, with the stated objective to "impact public policy and improve private lending behavior to address the gaps in access and resources." (Ex. 17 (Needs Assessment at 5).) The Needs Assessment stressed repeatedly that the CIAB will conduct an "examination" of each Deposit Bank and will "evaluate," "address," "explore," and "review" Deposit Banks' performance "in meeting the banking needs of NYC residents and businesses"—all avowedly regulatory objectives. (*E.g.*, *id.* at 1-2, 3, 18, 34, 48, and 63.) It also listed "recommendations" the CIAB received from the public, including requirements that Deposit Banks "accept NYC's municipal ID," cease "predatory lending," and offer "$200 credit lines to those formerly incarcerated." (*Id.* at 63-68.)

Because the CIAB's Needs Assessment "[was] based solely on publicly available 2013 data accessed from government sources deemed reliable," the CIAB "[was] not able to directly and decisively comment on the lending performance or underlying motivations of individual banks." (*Id.* at 5.) To rectify this "urgen[t]" problem (*id.* at 68), on May 13, 2015, the CIAB sought information from the Deposit Banks via an "introductory letter" from Econsult. This "introductory letter" was sent "for the purpose of requesting specific bank data in connection with [the RBA's] reporting act requirements" (Ex. 18 (May 13 Letter at 1)), and

asked each Deposit Bank to compile and provide, by June 12, 2015,[7] "specific bank data" on the exact topics specified in the RBA.  *Compare* RBA § 1 subdivs. 1, 3 *with* Ex. 18 (May 13 Letter at 1-2). These categories seek broad and amorphous information that each Deposit Bank will need to collect internally, to compile into usable form, and to provide to the CIAB.

## LEGAL STANDARD

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Here, most of the material facts are matters of public record reflected in the City and CIAB's own documents. The City, moreover, cannot manufacture an issue of fact by pretending it may not enforce the RBA as written.  The law "presume[s] that the government will enforce the law," *Hedges* v. *Obama*, 724 F.3d 170, 200 (2d Cir. 2013), and federal courts routinely hear *pre*-enforcement challenges, *see*, *e.g.*, *Pac. Capital Bank, N.A.* v. *Conn.*, 542 F.3d 341, 344 (2d Cir. 2008) (affirming summary judgment in pre-enforcement preemption challenge).

The presumption that a law will be enforced is especially important here, where the Council previously represented to this Court that there was "no provision nor sentence nor clause in [the RBA] that requires the board, the advisory board, to require information from [banks]" (Ex. 19 (Aug. 19, 2014 Tr. at 21:18-21)), and "we are not even sure if the board will ever make a request to the banks" (*id.* at 68:20-22).  As recent events confirm, the City is now enforcing the RBA as written, including seeking confidential information from Deposit Banks.

---

[7]    The CIAB's June 12 deadline, now adjourned to August 11, is completely arbitrary.  The CIAB has missed every deadline prescribed by the RBA itself, including the obligation to publish bank data by March 1, 2013 and March 1, 2014, § 1 subdiv. 5; a March 1, 2014 deadline to publish the needs assessment, *id.* subdiv. 1(a); and a March 1, 2015 deadline to publish the annual report, *id.* subdiv. 1(b).  The City missed literally years of deadlines in the RBA's implementation, including the full year after the inauguration of Mayor de Blasio.

"The purpose of a preliminary injunction is to preserve the status quo."[8]  *Tucker Anthony Realty Corp.* v. *Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989).  "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter* v. *NRDC, Inc.*, 129 S. Ct. 365, 374 (2008).  NYBA satisfies each of these criteria.[9]

## ARGUMENT

"The Supremacy Clause [of the U.S. Constitution] provides a clear rule that federal law 'shall be the supreme law of the Land.'"  *Ariz.* v. *U.S.*, 132 S. Ct. 2492, 2500 (2012) (quoting Art. VI, cl. 2). "Preemption can generally occur in three ways: [i] where Congress has expressly preempted state law, [ii] where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or [iii] where

---

[8]     NYBA seeks a preliminary injunction in the event that this Court determines that, even though NYBA is likely to succeed on the merits, there are issues of fact to resolve before granting judgment.

[9]     NYBA brings both a facial and as applied challenge to the RBA.  "Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application)."  *Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond* v. *United States*, 131 S. Ct. 2355 (2011).  In NYBA's view, "no set of circumstances exists under which [the RBA] would be valid."  *Wash. State Grange* v. *Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) (quotation marks and citation omitted); *see also Entergy Nuclear Vt. Yankee, LLC* v. *Shumlin*, 733 F.3d 393, 414-15, 426 (2d Cir. 2013) (affirming district court's finding of facial preemption of Vermont energy law).  This law, however, is also unlawful as it has been and will be applied to NYBA's members.  NYBA may therefore bring a facial and as-applied challenge in the same action.  *E.g.*, *U.S.* v. *Rybicki*, 354 F.3d 124, 132 (2d Cir. 2003) ("Irrespective of whether and to what extent we may consider a facial challenge, we can determine whether [the challenged statute] is constitutional as applied . . . under the circumstances at issue."); *cf. Citizens United* v. *FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

federal law conflicts with state law." *Wachovia Bank, N.A.* v. *Burke*, 414 F.3d 305, 313 (2d Cir.

2005).  These preemption doctrines also apply to whether local laws are preempted by State law.

*See Mayor of N.Y.*, 4 Misc. 3d at 156, 159.

## I.      THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO NYBA ON ITS CLAIMS THAT THE RBA IS PREEMPTED BY FEDERAL AND STATE LAW AND ISSUE A PERMANENT INJUNCTION.

Both the text of the RBA and the City's subsequent enforcement of this law leave

no doubt that it is preempted by both federal and State banking laws.  Because there are no

disputed issues of material fact, this Court should grant summary judgment to NYBA.

### A.      The RBA *Is* a Regulatory—Not Proprietary—Municipal Law.

In analyzing whether the RBA is preempted by federal or State banking laws, this

Court must first determine whether this law is "proprietary, rather than regulatory," *Healthcare*

*Ass'n of N.Y. State* v. *Pataki*, 471 F.3d 87, 109 (2d Cir. 2006), because "pre-emption doctrines

apply only to [] regulation," *Bldg. & Constr. Trades Council* v. *Assoc. Builders & Contractors of*

*Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993).  Local governments may not "escape[] pre-emption"

by invoking their spending power when, as here, they are exercising their "regulatory power."

*Wis. Dep't of Indus., Labor & Human Relations* v. *Gould, Inc.*, 475 U.S. 282, 287 (1986)

(finding Wisconsin debarment statute preempted).

Previously, the Council claimed that the RBA is "proprietary," and thus covered

by a limited "market participation" exception to preemption requirements.  (Council Mem. of

Law in Support of Mot. to Dismiss (No. 13-7212, ECF No. 18) at 26-30.)  This argument fails.

Whether a law is regulatory or proprietary turns on whether the law was designed to promote

"the efficient procurements of goods and services" or instead "the furtherance of a . . . policy."

*Chamber of Commerce* v. *Brown*, 554 U.S. 60, 70 (2008) (quotation marks and citation omitted);

*Gould*, 475 U.S. at 289 ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern.").[10]

The RBA clearly does not promote the City's *proprietary* interests as a bank depositor.  To determine if a law is proprietary or regulatory, the Court must "look[] primarily to the objective purpose clear on the face of the enactment."  *Bldg. Indus. Elect. Contrs. Ass'n* v. *City of N.Y.*, 678 F.3d 184, 191 (2d Cir. 2012).  The regulatory objectives underlying the RBA are clear on the law's face:  the RBA instructs a government entity to "assess the credit, financial and banking services needs of the City," "conven[e] . . . public hearing[s]," collect confidential "data and information" from Deposit Banks, and to "establish benchmarks, best practices, and recommendations" for the City's Deposit Banks.  § 1 subdiv. 1(a).  The law says *nothing* about collecting information concerning the quality or price of Deposit Bank services for the *City*—the information that a "proprietary" market participant would consider relevant in deciding whether to deposit funds in a bank.

The absence of any statement or evidence, either on its face or in its legislative history, that the RBA could save the City money or bring it better deposit services makes clear that the RBA does not seek to further the City's proprietary interests.  *See Mich. Bldg. & Constr. Trades Council* v. *Snyder*, 846 F. Supp. 2d 766, 789 (E.D. Mich. 2012) ("fact that the Legislature was unaware of any cost savings" a sign law was not proprietary).  Tellingly, the Council's own Fiscal Impact Statement estimated that the RBA will cost the City over $500,000 to enforce in its first fiscal year, but generate zero revenue.  (Ex. 3 (June 28 Fiscal Impact Statement at 2).)  Ms.

---

[10]     The same analysis applies to State preemption.  *E.g.*, *Matter of Council of N.Y.* v. *Bloomberg*, 6 N.Y.3d 380, 392 (2006) (law deemed regulatory as "the Council cannot and does not seriously assert that the purpose and likely effect of the law [wa]s to make the City's contracts cheaper or their performance more efficient").

Kloss even warned the City Council that because of the "very complex" nature of the City's finances "if one of [the Deposit Banks] chose not to comply with [the RBA] . . . and we are not allowed to use them . . . it could pose a hazard to [the City]."  (Ex. 2 (Mar. 7, 2011 Hr'g Tr. at 42:11; 42:20-24).)

In an effort to shoehorn the RBA into the "narrow" market participant "exception" to preemption requirements, *Nat'l Foreign Trade Council* v. *Natsios*, 181 F.3d 38, 63 (1st Cir. 1999), the Council maintained that this law "reflect[s] [the City's] own interest in its efficient procurement of needed [deposit] services," *Healthcare Ass'n*, 471 F.3d at 109, because the Court should "*imagine* [the City as] a large institutional depositor" who is "conscientious" and "civic-minded."  (Council Mem. of Law in Opp. to Mot. for Summ. J. (No. 13-7212, ECF No. 18 ("Council Opp.")) at 20, 23 (emphasis added).)  But the typical consumer of deposit services, or even a civic-minded large institutional depositor, does not enact a "Responsible Banking Act" and create an eight-member commission to conduct a community "needs assessment"—at great expense to itself—of matters having no bearing on the services being obtained.[11]  Nor does such a depositor demand access to confidential bank information or publicly evaluate banks' performance in meeting the needs of low-income and other communities.  The Council's theory would turn the entire market participant exception to

---

[11]     The process mandated by the RBA—whereby the CIAB must "accept[], review[], and consider[] public comments," *see* § 1 subdiv. 1(a)—likewise confirms the Council's regulatory motive to change the lending and other activities of Deposit Banks.  *See Metro. Taxicab Bd. of Trade* v. *City of N.Y.*, 2008 WL 4866021, at *11 (S.D.N.Y. Oct. 31, 2008) (Crotty, J.) ("[T]he process the City followed in promulgating the [challenged] Rules belies any claim that the City is acting as a proprietor rather than a regulator.  The City published notice of its intent to adopt new . . . rules in the City Record, took public comments, and then adopted the new rules. It even held additional public hearings.  This is not the kind of conduct the City engages in when it purchases vehicles for its own use.").

preemption on its head, because *any* locality could analogize its policy objectives to those of a "conscientious" (though decidedly atypical) market participant.

**B.      The RBA Is Preempted by Federal Law.**

Whether a federal law or regulation preempts a state or local law "is basically [a question] of [the legislature's] intent." *Barnett Bank, N.A.* v. *Nelson*, 517 U.S. 25, 30 (1996).  A state or local law is preempted where, as in this case, it is in "irreconcilable conflict" with federal law.  *Id.* at 31.  An "irreconcilable conflict" does not require a direct inconsistency, but exists when a state or local law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quotation marks and citation omitted).  "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n* v. *de La Cuesta*, 458 U.S. 141, 153 (1982).

**1.      In Direct Conflict with Federal Banking Law, the RBA Purports To Grant the CIAB Visitorial Powers Over National Banks.**

"[I]n the years since the NBA's enactment, [the Supreme Court] ha[s] repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation."  *Watters*, 550 U.S. at 11.  As part of its decision to create a national banking system, Congress granted the federal government exclusive visitorial powers with respect to national banks.  Specifically, Section 484(a) of the NBA unequivocally provides that:

> *[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law*, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

12 U.S.C. § 484(a) (emphasis added).

In keeping with Section 484(a), OCC regulations provide that "State officials may not exercise visitorial powers with respect to national banks, *such as conducting examinations, inspecting or requiring the production of books or records of national banks*, or prosecuting

-16-

enforcement actions, except in limited circumstances authorized by federal law."  12 C.F.R. § 7.4000(a)(1) (emphasis added).  This grant of exclusive visitorial powers to the OCC ensures that other regulators do not "subject[] national banks . . . to multiple audits and surveillance under rival oversight regimes."  *Watters*, 550 U.S. at 21.

The RBA's express statutory requirement that the CIAB "shall seek to collect" extensive information, including confidential and proprietary information, from Deposit Banks' books and records is a quintessential example of another party seeking to "inspect[] . . . books or records of national banks," 12 C.F.R. § 7.4000(a)(1), pursuant to a "rival oversight regime[]" in conflict with NBA Section 484(a) and OCC regulations.  *Watters*, 550 U.S. at 21.  Indeed, the CIAB has expressly stated that it intends to conduct "examination[s]" of Deposit Banks."  (Ex. 17 (Needs Assessment at 63).)

The Council claimed that the RBA's mandate to "collect information" is not an exercise of visitorial powers over Deposit Banks, because visitorial powers involve only "traveling to bank offices to inspect records or requires banks to let the CIAB see the records if they do show up."  (Council Opp. 28 & n.11.)  But federal visitorial powers over national banks are not so narrowly circumscribed to encompass only onsite visitation. Under the plain language of the applicable federal regulations, the City may not "inspect[] *or* requir[e] the production of books or records of national banks."  12 C.F.R. § 7.4000(a)(1) (emphasis added); *see also Cuomo* v. *Clearing House Ass'n, LLC*, 557 U.S. 519, 536 (2009) ("request for information" backed by an "implicit . . . threat" of a subpoena under N.Y. Executive Law constituted the impermissible exercise of visitorial powers over national banks); *Mayor of N.Y.*, 4 Misc. 3d at 158 (striking down "predatory lending" Local Law 36, emphasizing "[v]isitorial powers include

examination of a bank's books and records. Federal law thus prevents local regulatory access to national bank records.") (citation omitted).

> ## 2. In Direct Conflict with Federal Banking Law, the RBA Seeks To Regulate Lending and Other Core Banking Activities.

The Constitution does not permit the City to enact a law intended to coerce Deposit Banks to shape or to limit their deposit-taking and lending powers under federal law. *See Barnett*, 517 U.S. at 32-33 ("[G]rants of both enumerated and incidental 'powers' to national banks [are interpreted as] grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law," and "normally[,] Congress would not want States to forbid, or to impair significantly, the exercise of power that Congress explicitly granted.").

Under the NBA and OCC regulations, national banks may engage in a wide range of banking activities.[12]  For instance, OCC regulations explicitly provide that national banks "may receive deposits and engage in any activity incidental to receiving deposits . . . without regard to [certain] state law limitations." 12 C.F.R. § 7.4007.  In conflict with federal law, the RBA seeks to regulate Deposit Banks by establishing "benchmarks and best practices" concerning their efforts to "develop and offer financial services and products that are most needed by low and moderate income individuals and communities throughout the city and provide physical branches." §1 subdivs. 1(a), 3(b).

Similarly, OCC regulations provide that "national bank[s] may make real estate loans . . . *without regard to* [certain] *state* law limitations." 12 C.F.R. § 34.4 (emphasis added).

---

[12]     National banks have discretion, subject to federal law and OCC regulations, as to, *inter alia*, (i) where they open branches, *e.g.*, 12 U.S.C. § 36; 12 C.F.R. § 5.30, (ii) charging account fees and making related disclosures, *e.g.*, 12 C.F.R. § 7.4002, (iii) engaging in the business of residential mortgage lending, *e.g.*, 12 U.S.C. § 371; 12 C.F.R. §§ 34.1 *et seq.*, and (iv) making public welfare investments, *e.g.*, 12 U.S.C. § 24; 12 C.F.R. §§ 24.1 *et seq.*

In conflict with these regulations, the RBA pressures banks to engage in "settlement conferences[] and similar actions relating to mortgage assistance and foreclosure prevention" that meet standards established by the CIAB.  § 1 subdiv. 3(e).  And, the RBA demonstrates no regard for banks' obligations to conduct those activities in a prudent manner deemed safe and sound by federal regulators.  *See*, *e.g.*, 12 C.F.R. pt. 364 ("safety and soundness" of deposit institutions); 12 C.F.R. pt. 30 ("safety and soundness" of national banks).

Even more specifically, federal regulators already extensively regulate the financial products offered by national banks.  *See* Comptroller of the Currency, *Comptroller's Handbook: Real Estate Loans* 8 (1998) (detailing procedures "intended to determine the adequacy of the bank's policies, procedures, and internal controls as they relate to residential, home equity lending, reverse mortgages and affordable housing programs").  But, in conflict with federal regulations, the RBA requires Deposit Banks to "develop and offer financial products and services that are most needed by low and moderate income individuals," as determined by the CIAB.  § 1 subdiv. 3(b).[13]  The Needs Assessment previews what "financial products and services" the City's Deposit Banks should provide, requirements that will form the basis for the Annual Report's public evaluations of individual banks.  For instance, the Needs

---

[13]     To try to save the RBA's "rival oversight regime[]," *Watters*, 550 U.S. at 21, the City claims that the "city banking commission['s] . . . powers are untouched by this law."  (Ex. 20 (June 4 Hr'g Tr. at 26:12-13).)  But the City is spending at least half a million dollars to implement the RBA, has held hearings in every borough, has issued its Needs Assessment, and will soon issue the annual report, which the RBA states will be "transmitted to the banking commission" and "which *may be considered* by the banking commission in reviewing a bank's application for designation or redesignation as a deposit bank."  § 1 subdiv. 1(b) (emphasis added).  It strains credulity to imagine the City would go to all this trouble and then refuse to implement the law.  Moreover, laws designed to leverage the City's spending power to influence private behavior are preempted, even if they "share the same goals and . . . some companies may comply with both sets of restrictions."  *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 379, 373 n.7 (2000) (quotation marks and citation omitted) (state may not "use its spending power rather than its police power" to escape conflict preemption).

Assessment recommended that Deposit Banks should:  (i) provide lines of credit to individuals released from prison; (ii) lower "barriers to home mortgage lending"; and (iii) increase the "accessibility and convenience of bank locations."  (Ex. 17 (Needs Assessment at 63-68).)

Finally, as shown *supra* p. 8, the RBA expressly mandates that the CIAB make publicly available "***all***  information" § 1 subdiv. 4 (emphasis added), that Deposit Banks provide, except information on their "plan for and articulat[ion of] how the bank will respond to the [Needs Assessment]."  But federal banking laws and regulations, in stark contrast, carefully protect the confidentiality of their bank examinations, including to avoid the adverse impact the unfettered disclosure of such information could have on their safety and soundness.  OCC regulations, for example, forbid the release of any nonpublic supervisory information, 12 C.F.R. § 4.36(b), which includes any records created by the OCC, OCC bank examination reports, and "[c]onfidential information relating to operating and no longer operating national banks, Federal savings associations, and savings and loan holding companies as well as their subsidiaries and their affiliates."  12 C.F.R. § 4.32(b)(1).  In fact, financial institutions "are prohibited by law from disclosing . . . nonpublic supervisory information," and "may be subject to . . . criminal penalties" if they do so.[14]

### 3. In Direct Conflict with Federal Banking Law, the RBA Restrikes the Federal CRA's Carefully Struck Balance in Regulating Community Reinvestment.

The RBA also conflicts with the Federal CRA, 12 U.S.C. §§ 2901 *et seq*., which imposes a "continuing and affirmative obligation" on all FDIC-insured institutions "to help meet

---

[14]     Office of the Comptroller of the Currency, *et al*., *Interagency Advisory on the Confidentiality of the Supervisory Rating and other Nonpublic Supervisory Information* 1-2 (Feb. 28, 2005).

the credit needs of the local communities in which they are chartered," *id.* § 2901(a)(3), but only in a manner "consistent with the safe and sound operation of such institutions," *id.* § 2901(b).

In implementing the Federal CRA, the OCC, the FDIC, and the Federal Reserve have promulgated detailed regulations for depository institutions, including data collection requirements. *See* 12 C.F.R. pts. 25 (OCC regulation), 228 (Federal Reserve regulation), 345 (FDIC regulation). At the same time, those regulators have recognized that "excessive paperwork" comes "at the expense of providing loans, services, and investments to [banks'] communities." 60 Fed. Reg. 22156, 22157 (May 4, 1995). For example, those regulators have explicitly rejected requirements the cost of which "would outweigh the potential usefulness of more specific data." *Id.* at 22172.

The RBA imposes burdens on Deposit Banks beyond the Federal CRA's requirements. As Speaker Quinn acknowledged, the RBA "add[s] information *beyond what the [federal and State] community reinvestment acts require that banks disclose* and will make information even included in the CRA transparent in a way that CRA is not." (Ex. 8 (May 15, 2012 Hr'g Tr. at 40:24-41:4 (emphasis added)).) The RBA directs the CIAB to "collect *and consider* information *at the census tract level*," § 1 subdiv. 3 (emphasis added) and "*community district level*," *id.* § 1 subdiv. 3(e), while the Federal CRA activities of Deposit Banks are assessed at the level of metropolitan regions, not census tracts, 12 C.F.R. § 25.41(c). Thus, the RBA focuses on community reinvestment activities in 2,168 small, local areas within the City, while the Federal CRA examines those activities across the entire metropolitan New York area.[15]

---

[15]   The RBA also requests and examines different information from what is provided to regulators under the Federal CRA. For example, unlike the Federal CRA, the RBA seeks confidential and proprietary information from Deposit Banks about the "total number of loans that are at least sixty days delinquent, total number of foreclosures commenced, total number of foreclosures prevented through loan modification, short sales, deeds in lieu of foreclosure or

(footnote continued . . .)

The RBA also requires the CIAB to impose "benchmarks, best practices, and recommendations" for Deposit Banks, § 1 subdiv. 1(a)(2), beyond the Federal CRA, whose touchstone has always been flexibility.  For example, the RBA mandates that Deposit Banks "conduct consumer outreach, settlement conferences, and similar actions relating to mortgage assistance and foreclosure prevention, and provide information, at the community district level to the board, relating to mortgage and foreclosure actions . . . ."  *Id.* subdiv. 3(e).  The Federal CRA, by contrast, gives banks the option of "providing foreclosure prevention programs to low- or moderate-income homeowners who are facing foreclosure on their primary residence with the objective of providing affordable, sustainable, long-term loan modifications and restructurings" in order to gain credit under a "Service Test."  75 Fed. Reg. 11642, 11650-51 (Mar. 11, 2010).  But this is not a requirement.  Nor does the Federal CRA require financial institutions to accept "municipal ID[s] . . . as sufficient proof of identity."  (Ex. 17 (Needs Assessment at 63).)

Congress has also determined how and when the Federal CRA may be enforced.  "The CRA provides for enforcement only in the application context."  (Ex. 21 (Mem. from Walter Dellinger, Assistant Att'y Gen. for the U.S. Dep't of Justice, to Eugene A. Ludwig, Comptroller of the Currency 2 (Dec. 15, 1994)).)  In addition to publishing an institution's CRA rating, federal regulators consider a bank's rating when applying for charters, for deposit insurance, to open a branch, to relocate a main office or a branch, or to merge, consolidate with, or acquire another institution.  12 U.S.C. §§ 2902(3), 2903(a)(2).  But banks face no direct

---

(. . . continued footnote)

other mechanisms, total number of loan modifications applications, total number of loan modifications made and denied, and bank owned properties donated or sold at a discount." § 1 subdiv. 3(e).  Nor does the Federal CRA require banks to "reasonably address serious material and health and safety deficiencies in the maintenance and condition of the property" for property they have acquired through foreclosure.  *Id.* subdiv. 3(d).

sanction for non-compliance.  The RBA goes beyond the Federal CRA by using public shaming and the threat of debarment to enforce the CIAB's mandates against Deposit Banks.[16]

### C.  New York State Banking Law Preempts the RBA.

Under New York law, a law is preempted where, as here, "the State has evidenced its intent to occupy the field."  *Albany Area Builders Ass'n* v. *Town of Guilderland*, 74 N.Y.2d 372, 377 (1989).  As the City knows, "the [State] Banking Law contains a comprehensive regulatory scheme which evidences the state's intent to occupy the field."  *Mayor of N.Y.*, 4 Misc. 3d at 160; *cf. Mayor of N.Y.* v. *Council of City of N.Y.*, 6 Misc. 3d 533, 539 (N.Y. Sup. Ct. 2004) (City law preempted because State occupied field of textile procurement).

The Council attempted to evade this precedent on the theory that the City's authority to designate Deposit Banks under "home rule" provisions, N.Y.C. Charter § 1524 and N.Y. Gen. Mun. Law § 10(2)(a), means it may do so free of any restrictions.  (Council Opp. at 33.)  But "[t]he preemption doctrine represents a fundamental limitation on home rule powers," and "[w]here the State has preempted the field, a local law regulating the same subject matter is deemed inconsistent with the State's transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute," *Albany Area Builders*, 74 N.Y.2d at 376.  The RBA is therefore preempted "regardless of whether [it] conflict[s] with . . . the State statute or only duplicate[s] [it]."  *Lansdown Entm't Corp.* v. *N.Y.C. Dep't of Consumer Affairs*, 74 N.Y.2d 761, 765 (1989) (local law on alcohol consumption barred by field preemption).[17]

---

[16]     Moreover, under the Federal CRA, financial institutions with less than $250,000,000 in assets are inspected only every four or five years, depending on their CRA rating.  12 U.S.C. § 2908.  Under the RBA, these institutions now face significantly more oversight by a new regulator, who will issue an annual report, as the name suggests, every year.  § 1 subdiv. 1(b).

[17]     The RBA also conflicts with State Banking Law.  For instance,  it divests the DFS of powers that had been "specifically delegated" to it, *Sunrise Check Cashing & Payroll Servs., Inc.*

(footnote continued . . .)

**D.    The RBA's Use of Supposedly "Indirect" Means of Achieving the City's Regulatory Objective Does Not Save this Unconstitutional Law.**

Given the regulatory objectives underlying the RBA, Defendants are left to claim that this law is not preempted because compliance is merely "voluntary" (Ex. 20 (June 4, 2015 Hr'g Tr. at 22:8)), insofar as the City only pursues its regulatory objectives through public shaming and threatened debarment, rather than mandatory penalties or compulsory debarment. But the Supreme Court has squarely held that a state or local government cannot "use its spending power" to escape preemption "when two separate remedies are brought to bear on the same activity." *Gould*, 475 U.S. at 289 (quotation marks and citation omitted) (striking down Wisconsin debarment statute because "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of [judicial] concern").

Courts have rejected similar efforts to legislate around the preemption doctrine through the use of indirect means to accomplish an impermissible objective. *See Skilled Craftsmen of Tex., Inc.* v. *Tex. Workers' Comp. Comm'n*, 158 S.W.3d 89, 94-96 (Tex. App. 2005) (Occupational Safety and Health Act preempted state law requiring public designation of employer as "hazardous" based on state's injury); *Gen. Elec. Co.* v. *Callahan*, 294 F.2d 60, 62, 67 (1st Cir. 1961) (preempting state labor board from taking any action to mediate a labor dispute, even where the board had minimal binding authority, because "the obvious statutory purpose" of the law was to "invok[e] official action to mold public opinion"); *N.Y. News, Inc.* v. *N.Y.*, 745 F. Supp. 165, 169-72 (S.D.N.Y. 1990) (citing *Callahan* and enjoining the State from

_____

(. . . continued footnote)

v. *Hempstead*, 91 A.D.3d 126, 134, 138-39 (2d Dep't 2011), *aff'd on other grounds*, 20 N.Y.3d 481 (2013), such as the exercise of visitorial powers over State-chartered institutions, N.Y. Banking Law § 36.  The RBA also interferes with the State CRA, *id.* § 28-b, for substantially the same reasons it interferes with the Federal CRA.

convening a board of inquiry to issue non-binding "report and recommendations," because it was a formally sanctioned effort to "mold public opinion").  And while the City claims that "nothing that the [RBA] does affects how the city banking commission goes about its own business," and so it does not result in regulation (Ex. 20 (June 4, 2015 Hr'g Tr. at 16:7-8)), courts enjoin "discretionary" laws and regulations.  *See*, *e.g.*, *Nat'l Treasury Emps. Union* v. *Chertoff*, 452 F.3d 839, 844, 855 (D.C. Cir. 2006) (regulation that gave government the option to "reserve to itself the right to unilaterally abrogate lawfully negotiated and executed agreements is plainly unlawful").  NYBA's members need not "*risk[] the loss* of current and future government contracts," *Chamber of Commerce* v. *Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (emphasis added), simply because, under the cleverly worded RBA, the Banking Commission theoretically "may" ignore the CIAB's recommendations in making re-designation decisions—an especially implausible scenario when the majority of the Banking Commission consists of CIAB members.

Therefore, because the City may not "indirectly regulate[] within a preempted field in such a way that effectively mandates a specific, preempted outcome," the RBA is preempted.  *Metro. Taxicab Bd. of Trade* v. *City of N.Y.*, 633 F. Supp. 2d 83, 95, 98-100 (S.D.N.Y. 2009) (City rules that increased cap on lease payments for hybrid cars preempted as an impermissible local "mandate"); *Mayor of N.Y.*, 4 Misc. 3d at 155 (City law debarring "predatory lenders" "made the City a regulator").

## II.     IN THE ALTERNATIVE, THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION UNTIL IT CAN RULE ON THE MERITS OF NYBA'S CLAIMS.

Although this Court need not reach this question if it grants NYBA summary judgment and enters a permanent injunction, a preliminary injunction should issue if a plaintiff demonstrates that it is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).  As shown in Point I *supra*, NYBA is likely to win on the merits of its claims.  And NYBA plainly satisfies the other requirements for a preliminary injunction.

### A. NYBA Members Face Imminent Irreparable Harm.

A plaintiff need show only "a threat of irreparable harm, not that irreparable harm [has] already occurred." *Mullins* v. *City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010).  Here, the RBA will force Deposit Banks to choose between (i) subjecting themselves to unconstitutional regulation by the City or (ii) refusing to provide the information to Econsult, being publicly branded as non-compliant with the CIAB's attempt to gather information and Needs Assessment, and risk losing their depository status.  Each of these harms is independently sufficient to justify a preliminary injunction.

**Constitutional Harm**.  "When an alleged deprivation of a constitutional right is involved . . . no further showing of injury is necessary" to issue a preliminary injunction. *Mitchell* v. *Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984).  Without a preliminary injunction, NYBA's members that are national banks will be irreparably injured, because their right to be free from the exercise of visitorial powers by local regulators, a right granted by Congress via the Supremacy Clause, will be destroyed by the CIAB's attempt to gather information, even if NYBA prevails.[18]  *Trans World Airlines, Inc.* v. *Mattox*, 897 F.2d 773, 784 (5th Cir. 1990)

---

[18]     Courts have routinely found irreparable injury when national banks have had their right to be free from visitation by state entities violated.  *See, e.g.*, *First Union Nat'l Bank* v. *Burke*, 48 F. Supp. 2d 132, 149-50 (D. Conn. 1999) (finding irreparable injury sufficient to warrant a preliminary injunction in a visitorial powers case because "the Commissioner's enforcement actions continue to displace the OCC's supervisory authority in a way that cannot be undone, since the exercise of such administrative authority by the Commissioner is mutually inconsistent with the OCC's exclusive authority"); *Nat'l City Bank of Ind.* v. *Boutris*, 2003 WL 21536818, at *7 (E.D. Cal. July 2, 2003) (finding irreparable harm when "the Commissioner may still attempt to exercise visitorial powers over Plaintiffs"); *Wells Fargo Bank, N.A.* v. *Boutris*, 252 F. Supp.

(footnote continued . . .)

(finding "irreparable injury by depriving the airlines of a federally created right to have only one regulator"), *aff'd in part, rev'd in part on other grounds*, 504 U.S. 374 (1992).  This intrusion on federal visitorial powers will be especially damaging given that the CIAB will be publicly disclosing "*all* information collected, RBA § 1 subdiv. 4, including "proprietary information" that could cause NYBA members significant commercial harm if released.  (*See* Doran Decl. ¶ 11; Petraglia Decl. ¶ 11; Young Decl. ¶ 11; Landau Decl. ¶ 9; Quinn Decl. ¶ 12; Pollock Decl. ¶ 7; Hughes Decl. ¶ 10; Manuel Decl. ¶ 11.)

As demonstrated *supra* at 13-25, the NBA bars the CIAB's attempt to regulate banks, and because NYBA "seeks an injunction barring [the City] from precisely the type of interference with national banks that section 484 of the National Bank Act is intended to prohibit . . . [NYBA] is entitled to [] injunctive relief."  *Clearing House Ass'n, LLC* v. *Spitzer*, 394 F. Supp. 2d 620, 631 (S.D.N.Y. 2005) (Stein, J.).

**Compliance Costs**.  As the Second Circuit has recognized, nonrecoverable damages constitute irreparable harm.  *U.S.* v. *N.Y.*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming grant of preliminary injunction when "a suit in federal court against New York to recover the damages sustained by [the plaintiff] would be barred by the Eleventh Amendment").  The fifteen NYBA members that are Deposit Banks collectively will have to dedicate thousands of hours to comply with the RBA.  (*See* Milone Decl. ¶ 14; Doran Decl. ¶ 10; Petraglia Decl. ¶ 10; Young Decl. ¶ 10; Landau Decl. ¶ 8; Quinn Decl. ¶ 10; Pollock Decl. ¶ 6; Hughes Decl. ¶ 9; Liotta Decl. ¶ 10; Manuel Decl. ¶ 10.)  These injuries "cannot be remedied," *Chamber of Commerce* v.

---

(. . . continued footnote)

2d 1065, 1073 (E.D. Cal. 2003) (finding irreparable harm from a violation of visitorial powers when, in part, the "manual audit demanded" would cost "at least $60 per loan file").

*Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), because the Second Circuit has held that a party cannot seek monetary damages for NBA violations, as that would "[let] national banks to pursue § 1983 claims whenever preemption exists." *Wachovia Bank*, 414 F.3d at 323-24.

**Changed Business Conduct**.  A preliminary injunction also is required here because the RBA will "significantly disrupt [NYBA members'] business activities and cause substantial irreparable economic loss" by potentially requiring them to alter their conduct to comply with the law in order to avoid being branded as non-compliant or losing their depository status.  *Wells Fargo Bank, N.A.* v. *Boutris*, 265 F. Supp. 2d 1162, 1165, 1178-79 (E.D. Cal. 2003) (enjoining law preempted by NBA).  In so doing, NYBA members that are Deposit Banks would "be forced to incur large costs which . . . will disrupt and change the whole nature of [their] business in ways that most likely cannot be compensated with damages alone." *Am. Trucking Ass'n* v. *City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009); *see also Am. Fin. Servs. Ass'n* v. *Burke*, 169 F. Supp. 2d 62, 70 (D. Conn. 2001) (finding irreparable harm when plaintiff's members were forced to "either forgo making 'high cost home loans,' or making such loans with contracts lacking mandatory arbitration clauses," to comply with state law).

**Reputational Harm**.  The RBA also threatens "a loss of prospective goodwill" for NYBA members that are Deposit Banks, which will "constitute irreparable harm." *Tom Doherty Assocs.* v. *Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (irreparable harm from the loss of the right to "publish a book based on the Power Rangers").  The City's belief that "sunlight is the best disinfectant" (Ex. 8 (May 15, 2012 Hr'g Tr. at 40:18-24)), reflects its intent to use public pressure to alter Deposit Banks' conduct (and is preempted).  But the City cannot claim that its public hearings and reports on the shortcomings of Deposit Banks would not "harm [their] good will" or "affect [their] general reputation." *Nat'l Elevator Cab & Door Corp.* v.

*H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008).  This threat of reputational injury was central to the RBA's effort to "bring banks to the table," and presents a "substantial risk" of harm to NYBA's members.  *Susan B. Anthony List* v. *Driehaus*, 134 S. Ct. 2334, 2341 (2014).[19]

The City contends that Deposit Banks will suffer no reputational injury until November, when the CIAB's Annual Report is released.  But the City misses the point. Critically, it does not dispute that being "specifically identif[ied]," RBA § 1 subdiv. 1(b)(iii), in the CIAB's Annual Report for not meeting the CIAB's "benchmarks, best practices, and recommendations" or information demands will inflict reputational injury on Deposit Banks. And, NYBA's members that are Deposit Banks must *decide* now whether to comply with an unconstitutional law; they should not be forced to "violate the [] law" and face the consequences, if it is ultimately judged lawful at some future date.  *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *see also Am. Trucking*, 559 F.3d at 1057-58 (irreparable injury when "a very real penalty attaches to [the plaintiff's members] regardless of how they proceed").

**Loss of Deposit Status**.  NYBA's members that are Deposit Banks also will be harmed by the actual or threatened loss of deposit bank status.  "In the absence of a preliminary injunction, [NYBA] members could lose [deposit status] as well as the opportunity to

---

[19]    Although the reputational injury is "self-evident," *Gully* v. *NCUA Bd.*, 341 F.3d 155, 162 (2d Cir. 2003), NYBA members, based on their experience in the industry, fear that the RBA will harm their reputations, and thus their relationships with their customers and counterparties. (*See* Doran Decl. ¶ 12; Young Decl. ¶ 12; Petraglia Decl. ¶ 12; Landau Decl. ¶ 10; Quinn Decl. ¶ 12; Pollock Decl. ¶ 6; Hughes Decl. ¶ 9; Liotta Decl. ¶ 11; Manuel Decl. ¶ 12.)  The Supreme Court has likewise recognized the danger from "governmental action stigmatizing" parties.  *See Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U.S. 123, 160 (1951); *see also Patriot, Inc.* v. *U.S. HUD*, 963 F. Supp. 1, 5 (D. D.C. 1997) (HUD characterization of reverse mortgage lenders as "'pressuring' [senior citizens] to obtain reverse mortgages" created irreparable reputational injury).  Reputational injuries are irreparable because it is impossible to "calculate with any precision the amount of monetary loss . . . which would result in the future from [damage] to [NYBA's members'] relationships with customers."  *Register.com, Inc.* v. *Verio*, 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000) (Jones, J.), *aff'd*, 356 F.3d 393 (2d Cir. 2004).

meaningfully compete for [City deposits]." *Allied Const. Indus.* v. *City of Cincinnati*, 2014 WL 2931421, at \*15 (S.D. Ohio June 30, 2014) (enjoining preempted debarment statute); *see also Odebrecht Constr.* v. *Sec'y, Fla. Dep't of Trans.*, 715 F.3d 1268, 1287-89 (11th Cir. 2013) (irreparable harm from "the loss of an opportunity to bid" due to preempted statute even though the plaintiff had not successfully bid on a contract for fifteen years); *Glenwood Bridge* v. *City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (irreparable harm from the loss of the "right to bid on a legal contract" with Minneapolis).

The City has "reserve[d] to itself the right to unilaterally abrogate" Deposit Bank status, and it may not hold the "ever-present threat" of the loss of such status over NYBA's members. *Chertoff*, 452 F.3d at 844, 853-55. Indeed, NYBA Member Cross County Savings Bank chose to withdrew as a deposit bank *because* of the pressures of the RBA. (Cross County Decl. ¶ 14.)

**B.     The Public Interest and Balance of Equities Favor a Preliminary Injunction.**

"Once it is determined that state [and local] laws are preempted by federal law, the harm that the [government] may suffer if its laws are not enforced becomes irrelevant. Rather, the public interest will perforce be served by enjoining the enforcement of invalid provisions of state [and local] law." *Nat'l City Bank* v. *Turnbaugh*, 367 F. Supp. 2d 805, 822 (D. Md. 2005) (quotation marks omitted) (enjoining enforcement of law preempted by NBA). The public interest and the balance of equities both favor NYBA because "the balance of harms and the public interest appear to favor the side that has the better likelihood of success on the merits." *Prof'l Towing & Recovery Operators of Ill.* v. *Box*, 2008 WL 5211192, at \*14 (N.D. Ill. Dec. 11, 2008). *See also Valle Del Sol Inc.* v. *Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). ("[I]t would not be equitable . . . to allow [a government] . . . to violate the requirements of federal law, especially when there are no adequate remedies available.").

## CONCLUSION

For the foregoing reasons, NYBA respectfully requests that the Court grant summary judgment in NYBA's favor and permanently enjoin the enforcement of the RBA or, in the alternative, grant NYBA's motion for a preliminary injunction.

Respectfully submitted,

H. Rodgin Cohen (*cohenhr@sullcrom.com*)
Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
Marc Trevino (*trevinom@sullcrom.com*)
Matthew A. Schwartz (*schwartzmatthew@sullcrom.com*)
Thomas C. White (*whitet@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
(212) 558-4000

*Attorneys for Plaintiff*
*The New York Bankers Association, Inc.*

June 18, 2015