UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

THE NEW YORK BANKERS ASSOCIATION,
INC.,

                        Plaintiff,

              v.

THE CITY OF NEW YORK, *et al.*,

                   Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 7, 2015

15 Civ. 4001 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff New York Bankers Association, Inc. ("NYBA") initiated this action on May 26, 2015, seeking (i) a declaratory judgment that City Local Law 38 for the Year 2012, entitled the Responsible Banking Act (the "RBA"), is preempted by federal and state law; and (ii) a permanent injunction prohibiting the operation and implementation of the RBA. Plaintiff now moves for summary judgment on its claims, or, in the alternative, for an order preliminarily enjoining Defendants City of New York (the "City"), the New York Department of Finance (the "DOF"), and the Community Investment Advisory Board (the "CIAB") (collectively, "Defendants") from enforcing the RBA. Simultaneously, Defendants move to dismiss the Complaint on the grounds that the RBA is not preempted and, in the alternative, ask the Court to sever any provisions of the RBA that it deems preempted.

A review of the extensive record in this case confirms that while the animating concerns of the City Council are valid, the means by which it sought to harness banks to redress those concerns intrudes on the province of the federal and state governments.  Accordingly, and for the reasons discussed in the remainder of this Opinion, Plaintiff's motion for summary judgment is granted.[1]

## BACKGROUND[2]

The instant litigation is Plaintiff's second challenge to the RBA.  As such, the Court assumes a degree of familiarity with its Opinion in *New York Bankers Association* v. *City of New York* ("*N.Y. Bankers*"), No. 13 Civ. 7212 (KPF), 2014 WL 4435427 (S.D.N.Y. Sept. 9, 2014).  The focus of the Court's prior opinion was standing, and not the merits of Plaintiff's preemption claims.  For this reason, a more thorough recitation of the underlying facts — including an appropriately comprehensive account of the legislative history — is presented here.

---

[1]     The Court's ruling on the merits obviates the need to consider the request for a preliminary injunction.  Accordingly, whether Plaintiff would suffer irreparable harm in the absence of preliminary relief, which raises the issue of whether the NYBA's challenge to the RBA "as applied" is ripe for adjudication, need not be addressed in great detail.  Similarly, Defendants' motion to dismiss the Complaint for failure to state a claim can be denied as moot.

[2]     The facts alleged herein are drawn from the Complaint ("Compl." (Dkt. #1)), and the parties' submissions in connection with Plaintiff's motion for summary judgment, including Plaintiff's 56.1 Statement ("Pl. 56.1" (Dkt. #31)), and Defendants' responses thereto ("Def. 56.1 Response" (Dkt. #45)).  For convenience, the parties' briefs in connection with the motion for summary judgment and preliminary injunction will be referred to as "Pl. Br." (Dkt. #32); "Def. Opp." (Dkt. #43); and "Pl. Reply" (Dkt. #47).  The parties' briefs in connection with the motion to dismiss will be referred to as "Def. Br." (Dkt. #18); "Pl. Opp." (Dkt. #44); and "Def. Reply" (Dkt. #46).  The transcript of the August 5, 2015 oral argument will be referred to as "Aug. 5 Tr."

2

A word about that legislative history is in order: It is lengthy, and marked by an abrupt change in position following the change in mayoral administrations.  Broadly speaking, the Bloomberg administration concluded that the RBA was thoughtful but misguided, and, more importantly, preempted by federal and state law; the de Blasio administration concluded that the Act was an appropriate exercise of the City's discretion vis-à-vis the banks with which it deposited millions of dollars in City funds.  The legislative history is contained here, despite its length, because it illuminates the motivations of the RBA's sponsors and supporters.  In addition, the change in the City's position is discussed in detail, because that discussion yields contemporaneous insights into the legal issues now raised by the parties in this litigation.

## A.    Factual Background

### 1.    The Parties and the City's Deposit Bank System

Plaintiff NYBA is an association of approximately 140 commercial banks and federal savings associations located in New York State.  (Pl. 56.1 ¶ 9). NYBA's members include national banks chartered pursuant to the National Bank Act of 1864 (the "NBA"), ch. 106, 13 Stat. 99 (codified as amended in scattered sections of Titles 12, 19, and 31 of the United States Code); federal savings associations chartered pursuant to the Home Owners' Loan Act of 1933 (the "HOLA"), Pub. L. No. 73-43, 48 Stat. 128 (codified as amended at 12 U.S.C. §§ 1461-1470); and commercial and thrift depository institutions chartered pursuant to the New York Banking Law (the "NYBL").  (*Id.*).  Fifteen NYBA members serve as depositories for City funds.  (*Id.* at ¶ 8).

The New York City Banking Commission (the "Banking Commission")
was created in 1873 under the City Charter.  (Pl. 56.1 ¶ 1).  The members of
the Banking Commission include the Mayor of the City (the "Mayor"), the City
Comptroller (the "Comptroller"), and the Commissioner of the DOF.  (*Id.* at ¶ 2).
Among other things, the Banking Commission is responsible for designating
which banks and savings associations may hold the City's funds.  (*Id.* at ¶ 3;
*see also* N.Y.C. Charter § 1524(1) ("[The Banking Commission] designate[s] the
banks or trust companies in which all moneys of the city shall be deposited,
and may ... from time to time change the banks and trust companies thus
designated.")).  Only financial institutions that are designated as "Deposit
Banks" by the Banking Commission may hold City funds.  (Pl. 56.1 ¶ 4).

To become a Deposit Bank, an institution must submit an application
that includes audited financial statements, historical financial information, an
overview of the current managerial structure, its most recent federal
Community Reinvestment Act ("CRA") rating,[3] and other detailed information.
(Pl. 56.1 ¶ 13).  In addition, an institution must have a physical presence in the

---

[3]     The Federal Community Reinvestment Act, Pub. L. 95-128, 91 Stat. 1147 (1977)
(codified as amended at 12 U.S.C. §§ 2901-2908), provides that "regulated financial
institutions have [a] continuing and affirmative obligation to help meet the credit needs
of the local communities in which they are chartered."  12 U.S.C. § 2901(a)(3).  To this
end, the CRA "provides that a federal regulatory agency must 'assess the institution's
record of meeting the credit needs of its entire community, including low- and
moderate-income neighborhoods ... and ... take such record into account in its
evaluation of an application for a deposit facility by such institution.'"  *Lee* v. *Bd. of
Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 909 (2d Cir. 1997) (quoting 12 U.S.C.
§ 2903(a)(1) & (2)).

4

City.  (*Id.*).  As of May 2015, there were 21 Deposit Banks, 15 of which were NYBA members.  (*Id.* at ¶ 6).

### 2.    The RBA's Introduction and Evolution

#### a.    The November 23, 2010 Hearing

In the wake of the 2008 financial crisis, the New York City Council (the "City Council") Committee on Finance (the "Finance Committee") convened a hearing on November 23, 2010 (the "November 23 Hearing"), in order "to examine the process used by the Banking Commission when selecting the [City's] depository banks."  (Pl. 56.1 ¶ 10).  Domenic M. Recchia, Jr., then Chair of the Finance Committee, declared at the outset that

> [t]he Finance Committee will focus on a general overview of the  Banking Commission with an emphasis on the Banking Commission's relying on Banks['] Community Reinvestment Act activity when determining which banks are eligible to be the depository of [] City funds....  In light of the current fiscal and housing crisis, the Finance Committee wants to make sure that banks hand[l]ing the City's money are doing all they can to address the needs of the communities in which they serve while still ensuring that the City's money is safe and that the City is provided with the best available interest rate on its money.   The hearing today will seek to gain an understanding of the ... Banking Commission and its process for selecting depositories with an emphasis on the Banking Commission's reliance on the banks' commitment to providing services and programs that address the needs of the community in which [they do] business.

(*Id.* at ¶ 11).

Treasurer of the City of New York, Elaine Kloss, testified at the November

23 Hearing on behalf of the then-Commissioner of the DOF, David M. Frankel.

(Pl. 56.1 ¶ 12).  Treasurer Kloss explained that

> the [Banking] Commission reviews and approves or
> denies applications it receives from banks or trust
> companies to become New York City designated
> [Deposit Banks]....  A bank or trust company must
> apply to become a New York City [Deposit Bank] by
> submitting a formal application to the [Banking]
> Commission.  The application includes audited
> financial statements, historical financial information,
> current managerial structure, the bank's most recent
> Federal Community Reinvestment Act rating, and other
> detailed information.  To be approved as a [Deposit
> Bank], a bank or trust company must have a physical
> presence in the City of New York.  The Commission
> reviews the application and votes to approve or deny the
> financial institution as a New York City [Deposit Bank].

(*Id.* at ¶ 13).  Treasurer Kloss further testified that the Banking Commission "is

not a regulatory body" and "is not a regulator."  (*Id.* at ¶ 14).

Recalling his opening statements, Chairman Recchia asked Treasurer

Kloss whether the City Comptroller's annual survey of City bank accounts

sought information such as "what work [Deposit Banks] do in the community,

how many loans they give out to small business[es] ... [and] how many

mortgages they have modified."  (Pl. 56.1 ¶ 15).  Treasurer Kloss replied, "No I

don't believe they do that."  (*Id.* at ¶ 16).  Chairman Recchia explained that

> the CRA issue is really troubling to me and I think to
> many other Council Members [be]cause we would like
> to [address] other issues.   You know, the credit
> counseling and foreclosure prevention services, loan
> modifications, [whether banks are] providing affordable
> products, you know, to small consumers, smaller

6

> loans.... [T]hese are certain things that we think that
> the Banking Commission could do and should be doing.

(*Id.* at ¶ 17).  City Council Member Lewis A. Fidler added that he wanted to "know what efforts the [Banking] Commission makes to review and to in effect use the enormous power of [the] City as a depository to force banks or to pressure banks into being more cooperative with [the federal Home Affordable Modification Program]."  (*Id.* at ¶ 18).

After hearing testimony from a City resident concerning his problems with obtaining loan modification, Chairman Recchia informed the resident that

> [w]e heard what you're saying.  This is why we're having this hearing.  We are trying to address these — we are going to address these to try to help all these people. This is an issue that we can no longer just sit back and let it go.  That's why we're having this.  We're trying to be creative and finding ways that we could bring banks to the table, bring them out to the forefront to say now it's time to start modifying these loans, stop playing games, let's help those people that want to be helped, that could be helped, and we're trying to be creative.

(Pl. 56.1 ¶ 19).

### b.    The Bill Is Introduced Before the City Council

Following the November 23 Hearing, Introductory Number 485 ("Intro 485") was introduced before the City Council on February 16, 2011.  (Pl. 56.1 ¶ 21).  Intro 485 provided, in relevant part:

> The commissioner of finance, in consultation with agency heads, shall by rule establish criteria by which to evaluate whether banks are meaningfully addressing the credit and financial needs of the city and the communities throughout the city in which such banks do business.  Such criteria shall, at a minimum, include banks' efforts at the local level by New York City census

7

tract to: (1) address the key credit and financial services needs of small businesses; (2) work with borrowers to restructure delinquent home mortgage loans for which they are responsible; (3) develop and offer financial services and products that are most needed by low and moderate income individuals and communities throughout the city and provide physical branches; (4) provide funding, including construction and permanent loans and investments, for affordable housing and economic development projects in low and moderate income communities; (5) work with governmental entities and communities to address serious problems concerning the maintenance and condition of buildings financed by the institution; (6) partner in the community development efforts of the city; and (7) develop a strategic plan that details how the bank will meet the credit needs of low- and moderate-income consumers and communities for each of the above criteria and make progress in meeting the goals set forth in that plan. For each of these criteria, the commissioner should consider the annual number and dollar amount of loans, investments and services offered by each bank.

The commissioner shall, after holding a public hearing at which [Deposit Banks] and the public are given an opportunity to be heard, classify such banks according to such criteria and publish notice of such classification on the department's website and in the City Record. At the time such notice is published, the commissioner shall submit to the Council and to the banking commission, and post on the [DOF]'s website a report containing the following: (i) a detailed description of how the classification of each bank was determined; (ii) the role played in such determination by each of the criteria contained in the commissioner's rules and the commissioner's evaluation of each individual criterion; and (iii) the role played by public comments submitted to the [DOF] in connection with the hearing. At least thirty (30) days prior to the hearing, the commissioner shall publish all supporting materials submitted by such banks (including but not limited to data, reports, and strategic plans, if any) on the department's website. The failure of a bank to provide information requested by the commissioner for the purposes of this

> subdivision shall be grounds for the commissioner to lower the classification of the bank, and any such failure shall be detailed in the commissioner's report to the Council and the banking commission.   When choosing among banks offering comparable services at a comparable cost, city agencies may, in a manner consistent with law and guidelines established by the commissioner of finance, seek to deposit or invest funds at, and obtain services from, the available banks that have received the highest classification.

(Pl. 56.1 ¶ 22).

### c.      The March 7, 2011 Hearing

On March 7, 2011, the Finance Committee and the City Council's Committee on Community Development held a joint hearing to consider Intro 485 (the "March 7 Hearing").  (Pl. 56.1 ¶ 23).  Chairman Recchia again presided, and summarized the progress of both the bill and its animating policy goals:

> As a result of the [November 23 Hearing], the committees learned that the current members of the Banking Commission ... did not have a process in place to ensure that the [Deposit Banks] were meeting the needs of the communities in which they do business.
>
> So today, the Finance Committee and the Community Development Committee will consider Intro 485, which would require the [DOF], which is the administrative arm of the Banking Commission, to establish a classification system that would rank the community service involvement of banks that have been chosen to hold the City's funds....
>
> Such classifications would be made publicly and would be made available to the public so the taxpayers of New York can see what these banks are doing for our communities.  Not that the banks say they're doing this or they're doing that.  We want to know exactly what they're doing.  You know, how many loans are they

9

> modifying in a year, how many small business loans
> they're giving out, how they're helping the local
> businesses stay in business and stay in our
> communities.

(Pl. 56.1 ¶ 24).

Albert Vann, Chairman of the Committee on Community Development

and a co-sponsor of Intro 485, explicitly linked the City's financial relationship

with its deposit banks to the realization of those policy goals.  Specifically, he

noted that the City deposits

> more than $6 billion into various [Deposit Banks].   As
> a depositor of that scale, it is crucial that our city
> incentivize and support responsible banking that is
> beneficial to New York.  I believe that [the RBA] is certain
> to provide long-term benefits for both city residents and
> communities while strengthening and rebuilding
> traditional community development partnerships with
> banks.

(Pl. 56.1 ¶ 25).

In contrast, Treasurer Kloss testified at the March 7 Hearing on behalf of

the Commissioner of the DOF, in order "to explain the Administration's

opposition to Intro 485, which would require the creation of a new

classification system for banks." (Pl. 56.1 ¶ 26).  Specifically, Treasurer Kloss

testified that:

> While the bill has very good intentions, we must object
> to it because the [DOF], like any city agency, may only
> make its procurement decisions objectively and based
> on very specific product and service requirements.
>
> Moreover, we are concerned that the bill may lead to
> confusion among consumers and businesses who may
> believe that the [DOF] is regulating banks and assessing
> their performance, when in fact banks are regulated by

> federal and state authorities with respect to the matters
> covered by the criteria found in Intro 485.

(Pl. 56.1 ¶ 27).

During this first hearing on Intro 485, Treasurer Kloss raised the issue of whether the proposed legislation was preempted by federal and state law. To that end, Treasurer Kloss explained the DOF's "primary concerns with this bill," which stemmed from preemption concerns:

> The first relates to the provision that the [DOF] and
> other city agencies may take the classifications into
> account when procuring bank-related services. When
> the City procures a bank service, just as it does when it
> procures any service, its goal is to purchase the best
> service at the best price, which is good for both the [C]ity
> and for taxpayers. To do this, it procures services
> through an objective method. We believe that this is the
> right approach. When procuring banking services, the
> City focuses and should continue to focus solely on the
> financial safety and soundness of each bank, its
> banking capabilities and its pricing....
>
> Second, as you all know, the banking industry is
> already very heavily regulated by the state and federal
> governments. Indeed, the federal government has
> already passed a law that requires rating banks[']
> community reinvestment activities. The requirements
> of this law are similar to what the Council seeks to do
> in Intro 485. Our concern is that if this bill is passed,
> it might confuse, rather than help, because it is not
> clear how these classifications would coordinate with
> federal and state regulations.
>
> Finally, if the [DOF] were to issue bank classifications,
> it would give the public and businesses the impression
> that the City of New York oversees and regulates banks.
> It does not....
>
> In addition, the Corporation Counsel's office has legal
> concerns about the bill. In general, local governments
> are restricted when they try to regulate national and

11

> state-chartered banks' core banking activities, such as
> the extension of consumer mortgage credit and
> refinancing.   State law also limits our authority to
> consider policy matters when making purchasing
> decisions.

(Pl. 56.1 ¶ 28).

 In response to these concerns, Chairman Vann asked Treasurer Kloss:

> [D]on't you think it's better to have more information
> than less information?   I think we all agree with the
> primary responsibilities of the Banking Commission
> and we want all of the banks to be profitable and all of
> that.    But don't we also want them to serve the
> community,  the  financial  needs  of  communities,
> particularly the communities that are having these
> stresses right now in terms of [their] small businesses
> not being able to sustain themselves?    [A] lot of
> homeowners are losing their homes because of lack of
> support from our banks by modifying their loans and so
> forth.   Shouldn't we have that information as residents
> and bankers within New York City?   Shouldn't we just
> have the information?

(Pl. 56.1 ¶ 29).   Treasurer Kloss reiterated her concern about the message such

an information-gathering exercise by the City would send:   "If we ask for that

information, it will appear as though the city is governing banks.   We do not

regulate banks.   We're preempted by federal and state law."   (*Id.* at ¶ 30).

Putting a finer point on it, Treasurer Kloss stated the DOF's position that "this

bill is preempted by federal and state law."   (*Id.*).

 Chairman Vann disputed the DOF's assessment, stating:

> There's nothing here that preempts.   There's nothing
> here that requires.   It boggles my mind to think that we
> would not want to provide information that might be
> helpful because [of the way] it may appear; the
> appearance  of  something  you  see  as  being
> detrimental…. I know that I would not legislate or refuse

> to legislate because [of the way] something may appear, when something in fact would be a positive[,] and supportive of New York and those of us who require our banks to be supportive of stabilizing our community. Just as we bailed out the banks through public dollars and now we can't even find out from these banks what they're doing in our communities, when they used our tax dollars to become whole.

(Pl. 56.1 ¶ 33).

Chairman Recchia echoed Chairman Vann, asking Treasurer Kloss, "what is wrong with a bank … be[ing] rewarded because they're doing a lot in our community? … Could you tell me what's wrong with that?"  (Pl. 56.1 ¶ 34). Treasurer Kloss explained that, while she thought the "intention [was] well taken," "the city has very complicated banking processes [that] … only a handful of banks … can handle.…  If we lose one of those banks[,] and [it is] not allowed to participate because we've excluded [it] due to some rating, that's a hazard to our operation." (*Id.* at ¶ 35).[4]  Chairman Recchia was unmoved by these logistical concerns, announcing to Treasurer Kloss and those in attendance that:

> It's time that banks step up to the plate and help the people of the City of New York.  This City Council is no

---

[4]    Treasurer Kloss later provided more details on the "very, very complex, highly sophisticated banking service" that the City requires:

> Today there are only two or three banks that can handle the volume of transaction and the dollar amount that flows through Central Treasury.… That's all we have to choose from because other banks cannot handle it.  They don't have the services.  They don't have the capability to meet the needs that we have.  If one of these banks chose not to comply with [the RBA] and give us the information to classify them and we were not allowed to use them for the procurement process, it could pose a hazard to us.

(Pl. 56.1 ¶ 37).

> longer going to sit back and let banks get[] millions of
> dollars in deposits and let the Banking Commission just
> sit back and do nothing.  I have a problem with that.

(Pl. 56.1 ¶ 36).

The Finance Committee and the Committee on Community Development also heard testimony on March 7 from Wendy Takahisa, the Director of the New York State Banking Department's (the "NYSBD") Community Reinvestment division.  (Pl. 56.1 ¶ 40).  Ms. Takahisa made clear that the NYSBD

> support[ed] the idea that when choosing among banks
> offering comparable services at a comparable cost, city
> agencies should, in a manner consistent with law and
> established guidelines, seek to deposit or invest funds
> at and obtain services from the available banks that
> have received the highest classification in meeting[] the
> needs of the communities in which they operate.

(*Id.* at ¶ 41).  However, Takahisa "strongly urge[d] the City Council to consider an alternative method to achieve this worthy objective."  (*Id.*).  While the NYSBD "applaud[ed] the legislative intent to encourage banks to lend more, invest more and provide more services in New York City," it "believe[d] this goal can be achieved by using the existing CRA ratings, allowing the city to increase accountability for banks without using additional government resources or increasing the regulatory burden on banks."  (*Id.* at ¶ 42).

Ms. Takahisa also submitted written testimony on behalf of the NYSBD, again invoking preemption concerns.  In this testimony, Ms. Takahisa noted that "New York is one of only seven jurisdictions in the country that has a state or local CRA statute," and that the State "attempt[s] to conduct the CRA examinations concurrently with [its] federal counterparts to maximize

14

consistency in the examination process and ratings." (Pl. 56.1 ¶ 43).  Ms.

Takahisa went on to explain that these "CRA examinations are quite intensive":

> We look at performance over the span of several years,
> which gives us a clearer picture of whether community
> investment is trending upward or downward.  At the
> largest banks, a CRA examination generally involves
> hundreds of staff hours.  Even at the smallest banks,
> CRA examinations usually involve two weeks of on-site
> examination, in addition to time spent reviewing data
> off-site, both in preparation for the examination and in
> writing the evaluation.  In contrast, this amendment
> would ask the commissioner to judge a bank's
> performance based on a public hearing and a snapshot
> review of data already included in CRA evaluations.
> Reviewing and analyzing this material would require
> significant resources … and would impose an additional
> regulatory burden on banks, particularly the smaller
> banks, unfairly placing them at a disadvantage.

(*Id.* at ¶ 44).

City Council members, aware of federal and state regulatory regimes,

expressed concern that those regimes did not go far enough in obtaining

information or influencing bank conduct, thereby necessitating action by the

City.  Council Member Brad Lander, for one, inquired into the granularity of

federal and state CRA examinations.  When Ms. Takahisa testified that the

federal and state CRA examinations "go down generally to the count[]y level,"

and "look at Brooklyn, Bronx, [and] Manhattan separately," Mr. Lander

expressed dissatisfaction: "We need to get a lot more detail than that," because

"there is a whole set of neighborhood issues in our communities … we need a

local law that helps us really meet the community credit needs of our

neighborhoods, not just our counties."  (Pl. 56.1 ¶ 47).

15

### d.   The April 30, 2012 Hearing and the Amended Bill

Intro 485 was amended following the March 7 Hearing, and, on April 30, 2012, the Committee on Finance held another hearing (the "April 30 Hearing") to vote on the amended Intro 485 ("Intro 485-A").  (Pl. 56.1 ¶¶ 50-51).  At the April 30 Hearing, Chairman Recchia expressed his support for the bill, echoing Council Member Lander's previously stated views that "state and federal CRA ratings actually provide very little meaningful information regarding a bank's community level of services."  (*Id.* at ¶ 52).  Chairman Vann, co-sponsor of the bill, expressed hope that the RBA would "encourage the banks that receive city deposits to become more responsive and more accountable to New York City communities," and "ultimately achieve our goal of holding banks that receive city funds more responsible to the city and to our communities within the city." (*Id.* at ¶ 59).

Notably, Intro 485-A established a Community Investment Advisory Board (the "CIAB"), consisting of eight members.  (Pl. 56.1 ¶ 53).  The CIAB was established "to assess the needs of all of our communities for banking services and to evaluate how well those needs are being met."  (*Id.* at ¶ 54).  Its members were to include representatives on all sides of issues identified by the City Council, including organizations involved in community development, small business, and city banking.  *See* Local Law No. 38 Int. No. 485-A ("LL 38"), sec. 1, subdiv. 2 (2012).

The Bloomberg administration remained opposed, citing preemption and competence issues.  In this vein, DOF Commissioner Frankel submitted a

16

statement of opposition to Intro 485-A "to share [the DOF]'s continued

opposition to th[e] bill and [the DOF's] heightened concerns about the

unwarranted regulatory intervention this bill proposes":

> This bill, by creating a new entity and empowering that entity with the responsibility not only to evaluate banks but also the needs of the City's communities, is ill-conceived, overreaching, and far too costly.
>
> Fundamentally, the Banking Commission and the [DOF]'s role regarding the City's depository banks is to ensure that taxpayer money is deposited in banks that can best provide the safety and security of those deposits and the services the City needs.  This bill effectively anoints the [DOF] a banking regulator. However, neither [the DOF] nor any other City entity has the expertise, resources or legal authority to step into the much broader role contemplated by this legislation. This is not surprising since bank regulation should be and currently is a matter of primarily national interest and secondarily state interest.  Interposing yet another level of regulation at a municipal level threatens not only the overarching federal scheme but practically places the City at a competitive disadvantage to retain private banking functions and the tax revenues and jobs that come with them....
>
> Intro 485-A completely overhauls the mandated responsibilities of the [DOF] with respect to the operations of the Banking Commission and the designation of the City's depository banks.  The bill seeks to create an additional bureaucratic entity, a community investment advisory board, charged with conducting a biennial community level "needs" assessment.  The board would also issue an annual report that evaluates if and how well NYC designated banks meet the needs of the City's numerous communities.  The Banking Commission would consider the findings in the report when it considers the applications of banks to hold City funds and to do business with the City.

We recognize and support the need for all communities to be sufficiently serviced by banks.  However, this is already a function of the federal and state governments.  For example, the federal Community Reinvestment Act (CRA) ratings system requires banks to report their activities at the community level for evaluation of whether the needs of communities are met.  These ratings are done by professional staff skilled in the process with years of experience.  On the other hand, the … Banking Commission exists primarily to protect City money deposited at those regulated banks, not to regulate those banks.  The Banking Commission considers the federal CRA ratings and related State ratings in reviewing a bank[']s designation or re-designation application.  However, the paramount consideration for the Banking Commission is to ensure that the City's money is safe and that the banks will continue to provide their procured bank services to City agencies.

Additionally, the bill requires the [CIAB] to delve into the processes by which banks conduct their business and essentially impose best practices upon the banking industry.  Our federal and state governments do not impose best practices on private businesses but instead ensure consumer protection through law or regulation.  Therefore this bill not only encroaches upon the authority of higher levels of government but of private businesses as well.…

The enactment of Intro 485-A might also create confusion by giving the public and businesses the impression that the City of New York oversees, regulates and evaluates banks.  It does not and should not.  People could misinterpret the annual bank reports to mean that one bank has a stronger financial condition than another.  In reality, however, there are many other government agencies, like the U.S. Office of the Comptroller of the Currency, the FDIC, the Board of Governors of the Federal Reserve System and the newly created Consumer Financial Protection Bureau[,] plus the New York State Department of Financial Services, that have the authority, obligation and developed expertise to regulate these banks and their activities.  It is preferable that people seek guidance

18

> from these regulatory agencies for evaluation of bank financial stability and performance.
>
> Finally, but significantly, the Law Department has expressed concerns that the bill is preempted under state and federal law, and unlawfully impinges on the powers of the Mayor and Banking Commission....
>
> More importantly, we do not believe that this bill supports the fundamental purpose of the Banking Commission, which is to limit City deposits to institutions that are best equipped to secure taxpayer money while offering competitive pricing and services. Given the extensive regulatory scheme already in place, dedicating scarce City dollars to this effort would not be in the best interests of City taxpayers.

(Pl. 56.1 ¶ 60).

### 3.    The RBA's Passage and Dormancy Under Mayor Bloomberg

### a.    The RBA Passes over the Mayor's Veto

The dispute between the mayor and the City Council over the RBA came to a head in May 2012.  At a May 15 City Council meeting (the "May 15 Meeting"), the City Council voted on Intro 485-A.  (Pl. 56.1 ¶ 63).  Before the vote, Chairman Vann reiterated the concerns that had remained constant since the original introduction of the bill:

> We should know the banks that are providing credit to small businesses[;] we need to know who they are.  If they are financing affordable housing, we need to know that, and if they are modifying mortgages to keep our constituents in their homes, we need to know that.  To do nothing is [to] support[] irresponsible banking behavior and we've seen many examples of that in the past few years.  Today we are taking an affirmative step to ensure, encourage and support responsible banking in our city.

(*Id.* at ¶ 64).  Providing his perspective on the intra-governmental debate over whether the RBA was intended to "regulate" banks, Chairman Vann added: "Our bill does not regulate banks; it simply creates transparency which … 99% of the time is in the best interest of our society and indeed our city." (Def. 56.1 Response ¶ 64).  The City Council passed Intro 485-A by a vote of 44 to 4.  (Pl. 56.1 ¶ 65).

On May 30, 2012, Mayor Bloomberg vetoed Intro 485-A.  (Pl. 56.1 ¶ 66). He explained that Intro 485-A was "a misguided attempt to influence … banks … by overlaying extensive existing federal and State bank regulation with yet another layer of City regulation."  (*Id.* at ¶ 67).  He went on to echo the complaints of the bill's opponents:

> The bill extends beyond the City's competence and legal authority and risks reducing the number of banks who are willing or able to do business with the City….
>
> Importantly, neither the [DOF] nor any other agency within the City government currently has any expertise in the complex kind of evaluations, articulation of "best practices" for banks and bank supervision activities contemplated by the bill.
>
> In short, this bill adds an onerous and unnecessary third tier of regulatory oversight in an already heavily regulated area….
>
> Moreover, State and federal laws preempt the City from regulating State and national banks in this manner. Introductory Number 485-A serves no proprietary purpose but instead impermissibly uses the City's power to designate banks and deposit funds in order to pressure banks into adopting certain practices with respect to core banking matters such as lending to small businesses, addressing the credit needs of customers, handling foreclosure proceedings, and

> providing funding for housing.  The bill also interferes
> with regulatory regimes established elsewhere in federal
> and State law, and gives the Board an improper
> measure of oversight over banks by authorizing the
> Board to obtain and examine bank records beyond
> those required by existing government regulators....
> Creating a new third tier of analysis on banks'
> community investment and service efforts by yet
> another review board at the municipal level — outside
> of the City's expertise — is duplicative and a waste of
> taxpayer resources.

(*Id.*).

On June 28, 2012, the City Council overrode Mayor Bloomberg's veto
and enacted Intro 485-A as Local Law 38 of 2012, by a vote of 46 to 5.  (Pl.
56.1 ¶ 68).  Prior to the City Council's vote, then-Speaker Christine Quinn
offered her support of the bill:

> This bill is going to help us know which of those banks
> are doing the right things for small businesses, which
> of those banks are doing the right thing as it relates for
> homeowners.  It's also through the [CIAB] that got
> added to the bill going to … allow us to actually create
> a benchmark, if you will, for what is the state of banking
> in our neighborhoods and what do we need to improve
> it.  It is an incredibly important piece of legislation to
> make sure that community voices are part of the
> banking process.

(Pl. 56.1 ¶ 69 (Plaintiff's emphases omitted)).

Chairman Vann further added that:

> This override which you are about to do …, it really
> enacts the strongest local community reinvestment law
> in the nation.  Th[e] [RBA] emphasizes transparency
> and encourages community reinvestment.  Unlike the
> Mayor's protests, we do not require banks to do
> anything.  What we do is focus on transparency.  And
> unless you identify transparency as being a
> requirement, definitely it does not require, but it does

21

> shed the light, it does have involvement, it does let everybody in the city of New York know what's going on, and it does create an advisory board and the banks are represented on that board.   What they will do is … assess what's happening in your neighborhoods around the city in terms of what their banking needs are.
>
> It will determine if the banks where we give the taxpayers' money are, in fact, addressing those needs. This is very important, very significant, and I'm glad I have an opportunity to work to get this done.   And again, Mr. Mayor, despite your protests, banks are not going to run away from New York City.   I don't know of anyone who runs away from money, least of all banks, so I don't think we have to worry about that.

(Pl. 56.1 ¶ 70 (Plaintiff's emphases omitted)).

The June 28, 2012 Fiscal Impact Statement for Intro 485-A stated that Intro 485-A "will have no impact on City tax revenue"; instead, the estimated expenditures for fiscal year 2013 associated with Intro 485-A were estimated at $551,025.  (Pl. 56.1 ¶¶ 71-72).

### b.    The Structure of the RBA as Passed

The RBA has several components.  Principally, the RBA establishes the CIAB, comprised of eight members: (i) the Mayor or his designee; (ii) the Comptroller or his designee; (iii) the Council Speaker (the "Speaker") or her designee; (iv) the Commissioner of the Department of Housing Preservation and Development; (v) the Commissioner of the DOF; (vi) a member of a community-based organization "whose principal purpose is community and/or economic development, or consumer protection" designated by the Speaker; (vii) a representative of an organization or association that represents small business

22

owners designated by the Speaker; and (viii) a representative of the City banking industry designated by the Mayor.  LL 38 sec. 1, subdiv. 2.

The CIAB, in turn, has three primary functions.  First, it is tasked with completing a written assessment of the "credit, financial and banking services needs throughout the City with a particular emphasis on low and moderate income individuals and communities" (the "Needs Assessment").  LL 38 sec. 1, subdiv. 1(a).  To achieve this goal, the CIAB must (i) convene "at least one public hearing in each borough of the city"; (ii) "accept[], review[], and consider[] public comments which describe the nature and extent of such needs"; and (iii) consider certain data and information pertaining to the City's Deposit Banks.  *Id.*  The first Needs Assessment was to have been published on the DOF's website no later than March 1, 2014.  *Id.*

To complete the Needs Assessment, the CIAB is specifically tasked with collecting information at the "census tract level"[5] relating to each deposit bank's efforts to: (i) address the "key credit and financial services needs of small businesses"; (ii) develop and offer financial services and products that are "most needed by low and moderate income individuals and communities throughout the city," as well as to provide physical branches; (iii) provide funding for "affordable housing and economic development projects in low and

---

[5]   "In New York City, there are 2,168 census tracts, which typically have a population of about 3,000-4,000 and an average land area of 90 acres."  New York City Census FactFinder, available at http://www.nyc.gov/html/dcp/html/census/nyc_cff_userguide.shtml (last visited August 7, 2015)

moderate income communities"; (iv) address "serious material and health and safety deficiencies" in foreclosed and bank-owned properties; (v) "conduct consumer outreach, settlement conferences, and similar actions relating to mortgage assistance and foreclosure prevention," and provide information at the "community district level" to the CIAB regarding those efforts; (vi) "partner in the community development efforts of the city"; (vii) "positively impact … the city" through activities such as "philanthropic work and charitable giving"; and (viii) "plan for and articulate how the bank will respond to the credit, financial and banking services needs" identified in the Needs Assessment.  LL 38 sec. 1, subdiv. 3.  This information was to have been published on the DOF's website on or around March 1, 2013, and no later than March 1, 2014.  *Id.* at sec. 1, subdiv. 5.[6]  Significantly, the RBA required any such publication to "specifically identify any [Deposit Bank]'s failure to provide information requested in writing by the [CIAB]."  *Id.*

Second, the CIAB must use the information it gathers to "establish benchmarks, best practices, and recommendations for meeting the needs identified" in the Needs Assessment.  LL 38 sec. 1, subdiv. 1(a).

Third, the CIAB must compile and publish a report of its findings (the "CIAB Report" or the "Annual Report").  The first such report was to have been

---

6    Information relating to this final category — "how the bank will respond to … credit, financial and banking services needs" — was to be published only "to the extent not deemed confidential or proprietary."  LL 38 sec. 1, subdiv. 4.

published on the DOF website and transmitted to the Banking Commission by March 1, 2015, and each March 1 thereafter.  LL 38 sec. 1, subdiv. 1(b).

The CIAB Report must (i) evaluate how each Deposit Bank performed "relative to the benchmarks and best practices" established by the CIAB; (ii) identify "areas of improvement from past evaluations" as well as "areas where improvement is necessary" by the Deposit Banks in relation to the CIAB's "benchmarks and best practices"; (iii) "specifically identif[y] any [Deposit Bank]'s failure to provide information requested in writing by" the CIAB; (iv) summarize any written comments submitted to the CIAB, and the role of those comments; and (v) "summarize[], in tabular format, the data collected" from the Deposit Banks, "to the extent not deemed confidential or proprietary by the bank," at the "community district, borough, and citywide levels of aggregation."  LL 38 sec. 1, subdiv. 1(b).  Lastly, the RBA provides that the Banking Commission "may … consider[]" the CIAB Report when evaluating whether to designate or de-designate an institution as a Deposit Bank.  *Id.*

### c.   The Delay in Convening the CIAB

Having failed in his effort to veto the RBA, Mayor Bloomberg delayed its implementation by declining to appoint any individuals to the CIAB.  (*See* Pl. 56.1 ¶ 73).  Those appointments were to have been made by no later than August 27, 2012, but were not made.  *See* LL 38 sec. 1, subdiv. 2.  On May 29, 2013, Speaker Quinn wrote to Mayor Bloomberg to ask him to complete his appointments to the CIAB.  (Pl. 56.1 ¶ 74).  Deputy Mayor Robert Steel responded to Speaker Quinn's letter by reiterating that the Mayor believed the

RBA served no proprietary purpose, and was preempted by state and federal law.  (*Id.* at ¶ 75).  Accordingly, he noted, Mayor Bloomberg did "not intend to make the appointment[s] provided for in Local Law 38."  (*Id.*).

### 4. The Election of Mayor de Blasio, the Change in Position, and the Ascendancy of the RBA

#### a. The DOF Issues Requests for Information and Proposals

On November 3, 2013, Bill de Blasio was elected as the Mayor of the City. (Pl. 56.1 ¶ 78).  On December 24, 2013, shortly before his inauguration, the DOF issued a Request for Information (the "RFI") seeking information from vendors to help the CIAB implement the RBA and collect information from Deposit Banks.  (*Id.* at ¶ 79).  The RFI stated that "[t]he first CIAB annual report must be provided to the Banking Commission ... and published on [the DOF]'s website along with collected bank data."  (*Id.* at ¶ 81).  It also posed questions to potential data collection vendors, including, "How would you collect data from 25 Designated Banks and coordinate with [the DOF] and the CIAB?" and "How will you safeguard propriet[ary] information?"  (Def. 56.1 Response ¶ 82).

The RFI indicated the CIAB's intent to collect "proprietary or confidential information" down to "the census tract level."  (Pl. 56.1 ¶ 83).  It noted, however, that any information posted on the DOF's website would be "summarized at the community, borough and citywide levels of aggregation," and would not include information relating to any bank's plan to address the credit, financial, and banking services needs of the City identified in the Needs

Assessment, insofar as deemed proprietary or confidential by the producing banks.  (Def. 56.1 Response ¶ 83).

Several months later, on July 21, 2014, the DOF issued a Request for Proposals (the "RFP"), in which it sought bids from vendors to help the CIAB implement the RBA and to set a schedule for collecting information from the Deposit Banks.  (Pl. 56.1 ¶ 87).  The RFP echoed the RFI's assertion that the City will "collect … data at the census tract level," which may include data that is "proprietary or confidential."  (*Id.* at ¶ 88).  Additionally, the RFP noted that the data would also include "relevant information … from publicly available sources[.]"  (Def. 56.1 Response ¶ 88).

### b.    The Remaining CIAB Members Are Appointed

A further logjam was broken after the change in administration, when the remaining CIAB members were appointed.  The CIAB currently comprises Tracey Gardner (representing the Commissioner of Housing Preservation and Development), Jeffrey Shear (representing the Commissioner for the DOF), Blondel Pinnock (appointed by Mayor de Blasio), Tanisha Edwards (appointed by the City Council Speaker), Peter Hatch (representing Mayor de Blasio), Brian Cook (appointed by the City Comptroller), Christopher Kui (appointed by the City Council Speaker), and Bernell Grier (the representative of community development, housing, and consumer protection organizations).  (Pl. 56.1 ¶ 97).  As it happens, two members of the CIAB, Hatch and Cook, also hold positions as two of the three members of the City Banking Commission.  (*Id.* at ¶¶ 93-95).

27

### c.     The City Hires an RBA Consultant

In September 2014, the City selected Econsult to implement the RBA, and formally contracted with Econsult to provide services in November 2014. (Pl. 56.1 ¶ 98).  Econsult intends to collect and to analyze data regarding Deposit Banks, to "produce a ranking of [Deposit Banks] in key banking categories related to the topics delineated in the [RBA]," and to "narrate … how each [Deposit Bank] is meeting the needs identified" by the CIAB.  (*Id.* at ¶ 99). It will focus on "business lending and home mortgage lending … in moderate income neighborhoods."  (*Id.* at ¶ 100).

On December 18, 2014, Treasurer Kloss — now reflecting the views of an administration that supports the RBA — notified the City's Deposit Banks that the DOF "has engaged the services of Econsult Solutions, Inc. to assist the CIAB with the preparation of the biennial banking needs assessment and annual report.  In the coming weeks Michael Geffrard from LGR Group, LLC, which is a subcontractor of Econsult Solutions, Inc.[,] will contact you to request bank data in connection with [the RBA]."  (Pl. 56.1 ¶ 101).

### d.     The CIAB Holds Public Meetings

On January 13, 2015, the CIAB held a public meeting and announced its plan to publish the first Needs Assessment on April 9, 2015, and the first Annual Report on November 9, 2015.  (Pl. 56.1 ¶ 102).  At the January 13, 2015 hearing, City subcontractor Michael Geffrard stated that Econsult will "solicit … information" from the City's Deposit Banks "about how they can do things differently and better."  (*Id.* at ¶ 103).  Lee Huang, the Senior Vice

President and Principal of Econsult, also stated that the City's Deposit Banks would "need to respond to some of our findings and recommendations." (*Id.* at ¶ 104). Both Geffrard and Huang emphasized that, despite anticipated collection efforts from individual Deposit Banks, much of the data they intended to analyze was already publicly available. (Def. 56.1 Response ¶¶ 103-04).

Since its organizational meeting, the CIAB has held five public hearings, one in each borough. (Pl. 56.1 ¶ 106). The Association for Neighborhood and Housing Development, Inc. ("ANHD"), which is not an agency of the City, advertised these meetings in a February 5, 2015 email, which stated that: "The RBA lets the city use the power of [its] money to hold banks accountable to better meet the needs of our local communities. Th[e] RBA gives us a powerful tool to hold banks accountable and reward the best local bank reinvestment practices." (*Id.*; *see also* Def. 56.1 Response ¶ 107 (noting that the ANHD is not a City agency)).

### i.        The CIAB's Brooklyn Hearing

On February 9, 2015, the CIAB held the public hearing for the Borough of Brooklyn (the "Brooklyn Hearing"). (Pl. 56.1 ¶ 108). At the Brooklyn Hearing, Treasurer Kloss testified that the purpose of the Brooklyn Hearing was for the CIAB "to hear from the public how New York City designated banks are meeting their local credit, financial, and banking needs throughout the city with special emphasis on low and moderate income individuals." (*Id.* at ¶ 109).

At the Brooklyn Hearing, Jamie Weisberg testified on behalf of the ANHD. (Pl. 56.1 ¶ 110). Ms. Weisberg testified that the RBA "lets us use the power of our money to hold banks accountable." (*Id.* at ¶ 111). She also testified that banks "need to support small businesses with banking services," and that "not nearly enough money is being dedicated to neighborhood based community organizations." (*Id.*)

City Council Member Darlene Mealy testified at the Brooklyn Hearing. She testified that her goals included "to make sure that the banks in our neighborhood do give back to the community" because "we know the history of redlining." (Pl. 56.1 ¶ 112). Ms. Mealy further remarked:

> I'm looking forward to start working with banks in our neighborhood to make sure that they give back to the community in regards to maybe home equity lines of credit, credit cards…. If people don't have credit, you've got to start thinking about people coming back from incarceration. Let's try to get them credit cards of $200 to get them back into the community. So I'm looking forward to working with these banks and to make sure that everyone gets a fair share. And I had told my community if this conversation does not work with the banks and the community, then I'm asking them to take their money out of these banks in our neighborhood [that are] not being fair and giving back to the community.

(*Id.* at ¶ 113).

At the Brooklyn Hearing, Clifford Rosenthal, who had previously worked at the Consumer Financial Protection Bureau, testified in support of the RBA and thanked the CIAB "for going beyond what [the] CRA does….. It's really very encouraging." (Pl. 56.1 ¶ 115).

30

### ii.      The CIAB's Staten Island Hearing

On February 10, 2015, the CIAB held the public hearing for the Borough of Staten Island (the "Staten Island Hearing").  (Pl. 56.1 ¶ 116).  Ms. Weisberg testified again, noting that "we need banks making responsible loans .... People need access to banks, access to mainstream financial institutions, and also to products that meet their needs."  (*Id.* at ¶ 118).  Ms. Weisberg concluded by testifying that "it's really important that banks are acting responsibly.  We know what happens when they don't.  So thank you."  (*Id.* at ¶ 119).

The only other individual to testify at the Staten Island Hearing was City Council Member Deborah Rose.  (Pl. 56.1 ¶ 120).  Ms. Rose testified that "we must address the locations of banks in my district," and posed the question, "if banks are not giving loans to the community then what is happening to the money that residents are depositing?  The money should be flowing back into the community."  (*Id.* at ¶ 122).  She further opined that "[p]eople who have proof of their credit worthiness and have funds should be able to buy a home and shouldn't … fall prey to predatory lenders."  (*Id.* at ¶ 123)

### iii.      The CIAB's Bronx Hearing

On February 12, 2015, the CIAB held the public hearing for the Borough of the Bronx (the "Bronx Hearing").  (Pl. 56.1 ¶ 124).  Jim Buckley, an employee of the University Neighborhood Housing Program, testified at the Bronx Hearing that "the importance of the Federal Community Reinvestment Act cannot be emphasized in the return of bank investment to so many

31

communities.  The RBA is a positive and logical next step for the City to take in order to make banks more accountable."  (*Id.* at ¶ 125).

### iv.       The CIAB's Manhattan Hearing

At the final public hearing, held in Manhattan on February 18, 2015, Blondel Pinnock, a CIAB member, stated:

> I don't think you need to be vague about stating the name of the banks that you're dealing with and the issues that you may be encountering.  Because that's the only way that the Committee can make recommendations.  And remember, these banks hold deposits for the City of New York.  And if they're not giving back and doing what they're supposed to do, we need to know that.  So don't feel ashamed or afraid about saying the name of the bank that you're banking — or that you're encountering issues with.

(Pl. 56.1 ¶ 126; *see also* Def. 56.1 Response ¶ 126).[7]

### e.       The City Funds the "Responsible Banking" Pamphlet

During the CIAB's organizational meeting, and later at the meetings held in the five Boroughs, ANHD handed out a pamphlet, funded in part by the City, describing the RBA as an attempt to make "banks invest responsibly" and "to encourage banks seeking to hold city deposits to be more accountable to low- and moderate-income New Yorkers."  (Pl. 56.1 ¶ 127).  ANHD's pamphlet encouraged attendees at public hearings to ask, *inter alia*, whether banks: "provide the services you need and can afford"; have "bank employees [that] speak your language"; "help people become homeowners by offering loans and

---

[7]       On February 17, 2015, the CIAB held a hearing in Queens.  Plaintiff has not supplied a transcript from the Queens hearing as part of the summary judgment record, nor have the parties included any details from the Queens hearing in their motion papers.

supporting first-time home buyer programs"; "make grants to community organizations"; ensure there are "enough jobs for people in your neighborhood"; and "offer services and make loans to small businesses." (*See id.* at ¶ 128; Def. 56.1 Response ¶ 128). ANHD advertises that its pamphlet was funded by the "New York City Department of Cultural Affairs in partnership with the City Council." (Pl. 56.1 ¶ 129).

f.    **The CIAB Holds a Needs Assessment Hearing and Sends the Deposit Banks a Re-Designation Notice**

On April 1, 2015, the CIAB held a hearing to preview the Needs Assessment. (Pl. 56.1 ¶ 130). There, members confirmed that "[t]he interpretation of what [the Needs Assessment] means from a policy standpoint ... will really intensify as we look at the second half of this exercise, which is how are the individual designated banks doing relative to the citywide averages, relative to the needs that have been expressed in the assessment." (*Id.* at ¶ 131). Dan Miles of Econsult also stated that the CIAB would "make some direct requests ... of the banks for information that is only partially publicly available." (*Id.* at ¶ 132; Def. 56.1 Response ¶ 132). Mr. Miles indicated that, through an "iterative process," the CIAB will be requesting information relating to, among other things, bank "economic development efforts, foreclosed properties, and outreach efforts," and asking Deposit Banks "to verify the data [it] ha[s] on them." (Pl. 56.1 ¶ 132).

On February 2, 2015, the Deposit Banks were sent a "2015 re-designation notice" and a list of the documentation required for designation. (Pl. 56.1 ¶ 133).

### g. The City Releases Its Needs Assessment

On April 30, 2015, the CIAB released its Needs Assessment. (Pl. 56.1 ¶ 135). The Needs Assessment announced its purpose as that of "impact[ing] public policy and improv[ing] private lending behavior to address the gaps in access and resources that [it] identified." (*Id.* at ¶ 136). It further stated that "this Needs Assessment report and the Annual Report that will follow represent an important first for NYC: a comprehensive assessment of banking activities." (*Id.* at ¶ 137). As part of its effort to "improve private lending behavior," the Needs Assessment evaluated City banks based on the number of home loans, small business loans, and branch locations to see whether they were serving "the needs of ... low-income neighborhoods and other potentially vulnerable communities." (*Id.* at ¶ 138).

The Needs Assessment stated that, to prepare the forthcoming Annual Report, the CIAB will be conducting an "examination of [Deposit Banks]." (Pl. 56.1 ¶ 141). The Needs Assessment stated that the "examination" would involve a "specific exploration of individual [Deposit Banks'] performance in meeting the banking needs of NYC residents and businesses." (*Id.* at ¶ 142). The process would involve gathering information about "what each [Deposit Bank] is doing to serve low-income communities in NYC, identify[ing] areas of improvement, and rank[ing] the [Deposit Banks] based on their performance in

34

the previous year." (*Id.* at ¶ 143).  In conducting its "examination," the CIAB would be "interfac[ing]" with Deposit Banks as "part of the preparation of the Annual Report" to gather data about each bank's "policies, programs, and performance." (*Id.* at ¶ 144).  The Annual Report was intended to "directly and decisively comment on the lending performance or underlying motivations of individual banks or groups of banks as it relates to any disparities across communities throughout NYC." (*Id.* at ¶ 145).

The Needs Assessment noted particular categories as to which it was believed the CIAB would need to collect information not available under the Federal CRA, including: depository banks at the census tract level, multi-family loan portfolios, mortgage loan modifications, servicing of distressed mortgages, foreclosure prevention initiatives, and financial products for low to moderate-income residents.  (Pl. 56.1 ¶ 146).  The Needs Assessment also noted that the CIAB

> did not have access to many key pieces of information used by banks to make lending decisions on individual applications, such as credit score, debt load, wealth level, or loan-to-value ratio.  As such, it is not able to directly and decisively comment on the lending performance or underlying motivations of individual banks or groups of banks as it relates to any disparities across communities throughout NYC.

(*Id.* at ¶ 147).

Similarly, the Needs Assessment noted that the CIAB "[did] not have access to some of the key variables that determine whether or not a borrower is offered a home loan and the type of loan that the individual receives (prime vs.

35

subprime).  These variables included credit score, debt-to-income ratio, wealth, and other measures." (Pl. 56.1 ¶ 148).  To that end, the Needs Assessment stated that "the Annual Report will explore further which [Deposit Banks] are making home loans in which NYC communities." (*Id.* at ¶ 149).  It also noted that "the forthcoming Annual Report will evaluate each [Deposit Bank's] performance in making loans to small businesses" as well as "where [Deposit Banks] are making business loans." (Pl. 56.1 ¶ 151; *see also id.* at ¶ 152 ("[t]he forthcoming Annual Report will review the bank branch locations of each [Deposit Bank]")).

A large number of the Needs Assessment's areas of focus related to low- to moderate-income residents.  For example, it noted that: (i) the "strict requirements used by the Bank Chex System to evaluate credit worthiness, including credit history, … prevent[s] many low and moderate-income residents from being qualified by banks to open an account"; (ii) "[m]any deem the bank fees for basic account services to be too high for low and moderate income NYC residents"; (iii) "[b]ank locations closest to unserved or underserved neighborhoods are traditionally clustered along commercial corridors," and "the scarcity of these bank branches has led to congestion, long wait times and poor quality service"; and (iv) "[t]here was concern that low-income borrowers lack access to home mortgage loans." (Pl. 56.1 ¶¶ 154-58).  Other areas of focus included "irresponsible lending," "predatory lending," "support for small businesses," "low levels of investments in community based organizations," and

"product development" (including, for example, offering credit cards with low-level credit lines). (*Id.* at ¶¶ 159-63).

### h.      The CIAB Requests Information from Deposit Banks

On May 13, 2015, the CIAB sent an "introductory letter" to the City's Deposit Banks "for the purpose of requesting specific bank data in connection with the RBA reporting act requirements." (Pl. 56.1 ¶ 164). The letter was sent to the individual at each Deposit Bank responsible for maintaining the bank's depository relationship with the City. (*Id.* at ¶ 165). It recited that the CIAB had collected "preliminary data … from public sources relating to branch location, home lending and business loans," and asked the Deposit Bank recipients to "review the data … and confirm that it is correct," because "[t]his information will appear in the annual report." (*Id.* at ¶ 166). The CIAB's letter also asked Deposit Banks to provide information on "each [Deposit] Bank's efforts to" address each of the eight categories set forth in the RBA that sought to gauge whether the Deposit Banks were meaningfully addressing the credit and financial needs of the City and its constituent communities. (Pl. 56.1 ¶ 167; *see also* LL 38 sec. 1, subdiv. 3(a)-(h)).

### i.      The Costs of Compliance for Deposit Banks

The topics on which the CIAB seeks information, including the number of "foreclosure actions," "loan modifications," and the number of loans "at least sixty days delinquent," can reflect the financial health of a Deposit Bank. (Pl. 56.1 ¶ 189). Plaintiff advises, and Defendants do not seriously dispute, that much of the information sought by the CIAB from the Deposit Banks is

37

confidential and involves trade secrets or personal or proprietary information. (*Id.* at ¶ 190).  Although the RBA requires the publication of "all supporting materials submitted by such banks ... on the [DOF's] website," LL 38 sec. 1, subdiv. 4, and the introductory letter "cites no provision of the RBA allowing the CIAB to ignore the express terms of the Act" (Pl. 56.1 ¶ 192), Defendants nonetheless "aver that the CIAB is not bound by the RBA to publish confidential or proprietary information that it might receive" (Def. 56.1 Response ¶ 192).

NYBA members invest substantial resources ensuring compliance with applicable federal laws and regulations, including the Federal CRA.  (Pl. 56.1 ¶ 186).  Certain NYBA members that are Deposit Banks have stated that the RBA is more invasive than the Federal CRA and asks for information beyond what is required under the Federal CRA.  (*Id.* at ¶ 183).  Complying with the CIAB's "introductory" letter will be burdensome for certain NYBA members who are Deposit Banks and they will need to expend resources to do so.  (*Id.* at ¶ 200 (citing declarations from representatives of nine Deposit Banks)).  Indeed, at least one bank has chosen to cease being a Deposit Bank because of the "the economic burden associated with gathering the information required by the Responsible Banking Act."  (*Id.* at ¶ 199).  Certain NYBA members who are Deposit Banks are also concerned about the consequences to their reputation, and consequently to their business, if they do not comply with the CIAB's introductory letter and/or receive a favorable evaluation from the CIAB. (*Id.* at ¶ 201).

The CIAB initially requested that information be provided by June 12, 2015, noting that the Annual Report must account for each Deposit Bank's efforts to meet the CIAB's requests for information.  (Pl. 56.1 ¶ 168).

## B.    Procedural Background

Plaintiff filed its complaint in *N.Y. Bankers* on October 11, 2013.  2014 WL 4435427, at *1.  On October 25, 2013, the City's Law Department sent a letter to the Court, stating, in part, that:

> The Mayor's veto message sets forth legal and policy reasons for the Mayor's disapproval, including that the law is preempted by State and federal laws concerning the regulation of banks, the same grounds upon which plaintiff seeks relief here.  Consistent with the Mayor's veto message, the City's position on the merits of the action is that Local Law 38 is preempted.  Thus, the City's position in this litigation is substantively in alignment with the [NYBA].

(Pl. 56.1 ¶ 77).  On March 21, 2014, after Mayor de Blasio took office, the City's Law Department submitted a letter to this Court stating "that the City has reconsidered its position concerning the validity of Local Law 38 of 2012 … and now supports its validity."  (*Id.* at ¶ 85).  On September 9, 2014, upon consideration of dispositive motions filed by the parties, the Court dismissed the complaint for lack of standing.  *N.Y. Bankers*, 2014 WL 4435427, at *1.

In dismissing the complaint, the Court noted that "Plaintiff brings serious substantive claims, and while it did not have standing to pursue them in October 2013, the Court takes no position on whether pleading modified in accordance with this Opinion, in addition to the events of the intervening year — or, alternatively, the occurrence of certain anticipated events, such as

the convening of the CIAB or the award of the contract to provide support services to the CIAB — would be sufficient to establish standing." *N.Y. Bankers*, 2014 WL 4435427, at *14.

Plaintiff filed the instant action on May 26, 2015, after, *inter alia*, the Deposit Banks received the CIAB's introductory letter. (Dkt. #1). The parties requested a pre-motion conference on an expedited basis, in no small part because of the looming June 12, 2015 deadline for compliance with the CIAB's introductory letter. (Dkt. #4, 6). The Court held a pre-motion conference on June 4, 2015, the earliest date the parties were available, to discuss a briefing schedule. (*See* Dkt. #15).

At the conference, the Court inquired as to whether the June 12, 2015 deadline could be extended to permit dispositive motion practice, or if the parties anticipated submitting briefing on whether a temporary restraining order ("TRO") should issue. Counsel for Defendants indicated he would confer with his clients to see if the deadline could be extended to obviate the need for TRO briefing. During the conference, Defendants also conceded that, since the RBA is now being enforced, the NYBA's standing was no longer at issue. (Dkt. #15 at 13-14).

Following the conference, Defendants submitted a letter stating that the June 12, 2015 deadline would be extended for 60 days, to August 11, 2015. (Dkt. #11). After holding a subsequent telephone conference with the parties, the Court issued a scheduling order that provided for expedited briefing of dispositive cross-motions. (Dkt. #14). To address Plaintiff's concern regarding

the imminence of the August 11, 2015 deadline, the parties agreed to file, simultaneously, briefing on the issue of whether a preliminary injunction should issue.  The parties' opening briefs were filed on June 18, 2015; their opposition papers were filed on July 19, 2015; and their reply papers were filed on July 29, 2015.

On July 2, 2015, *amici* American Bankers Association, the Independent Community Bankers of America, and the Independent Bankers Association of New York filed a brief in support of Plaintiff's motion for summary judgment ("ABA Br." (Dkt. #36)), and *amici* ANHD, Legal Services-NYC, New Economy Project, and the National Community Reinvestment Coalition filed a brief in support of Defendants' motion to dismiss ("ANHD Br." (Dkt. #38)).

The Court held oral argument on August 5, 2015, and informed the parties thereafter that a decision from the Court would issue before August 11, 2015.

## DISCUSSION

### A.   Applicable Law

#### 1.   The Standard for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a

41

genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v.

*U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### 2.    Preemption Generally

The Supremacy Clause invalidates any state law that is contrary to federal law.  U.S. CONST., ART. VI, cl. 2; *Gibbons* v. *Ogden*, 22 U.S. 1, 211 (1824).  "Where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power."  *United States* v. *Gillock,* 445 U.S. 360, 370 (1980).  Simply put, a state law (and, by extension, a local law) that conflicts with federal law is of no effect.  *Cipollone* v. *Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981)).

The exercise of federal supremacy is not to be lightly presumed.  *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522 (1981) (internal citations omitted).  In fact, there is a strong presumption against federal preemption of

local legislation.  *Richmond Boro Gun Club, Inc.* v. *City of New York*, 97 F.3d
681, 687 (2d Cir. 1996).  "The presumption against federal preemption
disappears, however, in fields of regulation that have been substantially
occupied by federal authority for an extended period of time.  Regulation of
federally chartered banks is one such area."  *Wachovia Bank, N.A.* v. *Burke*,
414 F.3d 305, 314 (2d Cir. 2005) (quoting *Flagg* v. *Yonkers Sav. & Loan Ass'n,
FA*, 396 F.3d 178, 183 (2d Cir. 2005)); *see also Cuomo* v. *Clearing House Ass'n,
L.L.C.*, 557 U.S. 519, 554 (2009) (Thomas, J., concurring in part and dissenting
in part) ("[T]his presumption is not triggered when the State regulates in an
area where there has been a history of significant federal presence.  National
banking is the paradigmatic example[.]" (internal citations and quotation marks
omitted)).

"Federal preemption of a state statute can be express or implied, and
generally occurs: [i] where Congress has expressly preempted state law,
[ii] where Congress has legislated so comprehensively that federal law occupies
an entire field of regulation and leaves no room for state law, or [iii] where
federal law conflicts with state law."  *Pac. Capital Bank, N.A.* v. *Connecticut*, 542
F.3d 341, 351 (2d Cir. 2008) (citing *SPGGC, LLC* v. *Blumenthal*, 505 F.3d 183,
188 (2d Cir. 2007)); *accord Madden* v. *Midland Funding, LLC*, 786 F.3d 246,
249 (2d Cir. 2015).

In analyzing whether a statute is preempted by federal law, a court must
first determine whether this law is "proprietary, rather than regulatory,"
*Healthcare Ass'n of N.Y. State* v. *Pataki*, 471 F.3d 87, 108 (2d Cir. 2006),

because "pre-emption doctrines apply only to … *regulation*," *Bldg. Indus. Elec. Contractors Ass'n* v. *City of New York* ("*BIECA*"), 678 F.3d 184, 187 (2d Cir. 2012) (quoting *Bldg. & Const. Trades Council of Metro. Dist.* v. *Associated Builders & Contractors* ("*Boston Harbor*"), 507 U.S. 218, 227 (1993) (emphasis in *Boston Harbor*)).  Thus, if the RBA is regulatory, the Court must determine whether this law is preempted because it conflicts with federal law.  *See Barnett Bank, N.A.* v. *Nelson*, 517 U.S. 25, 31 (1996).

New York recognizes similar grounds for preemption of local laws. *Consol. Edison Co. of New York* v. *Town of Red Hook*, 60 N.Y.2d 99, 105 (1983). A New York State law will preempt a local law where "the State has evidenced its intent to occupy the field," *Albany Area Builders Ass'n* v. *Town of Guilderland*, 74 N.Y.2d 372, 377 (1989), or there is otherwise a "conflict between local and State law," *Cohen* v. *Board of Appeals*, 100 N.Y.2d 395, 400 (2003) (quotation omitted).

## B.    Analysis

### 1.    The RBA Is Regulatory

As the Second Circuit has explained, "[i]n distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate …, the key is to focus on two questions":

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat an inference that its primary

goal was to encourage a general policy rather than
address a specific proprietary problem?

*Healthcare Ass'n*, 471 F.3d at 109 (quoting *Cardinal Towing & Auto Repair, Inc.*
v. *City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999)).   The same analysis
applies to state preemption.   *See Matter of Council of City of N.Y.* v. *Bloomberg*,
6 N.Y.3d 380, 392 (2006) (deeming local law regulatory where "the Council …
[did] not seriously assert that the purpose and likely effect of the law [wa]s to
make the City's contracts cheaper or their performance more efficient," and
where the law was instead "obviously designed as an enactment of social
policy" (internal quotation marks and citations omitted)).

"[W]hen a court assesses whether a governmental policy has a regulatory
purpose, it looks primarily to the objective purpose clear on the face of the
enactment, not to allegations about individual officials' motivations in adopting
the policy.…   [P]reemption doctrine evaluates what legislation *does*, not why
legislators voted for it or what political coalition led to its enactment.   *BIECA*,
678 F.3d at 191 (emphasis in original).   That said, courts "do not blindly accept
the articulated purpose of a state statute for preemption purposes"; "legislative
history is an important source for determining whether a particular statute was
motivated by an impermissible motive in the preemption context."   *Entergy
Nuclear Vermont Yankee, LLC* v. *Shumlin*, 733 F.3d 393, 416, 419 (2d Cir. 2013)
(citations and alteration omitted); *see also Loyal Tire & Auto Ctr., Inc.* v. *Town of
Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006) (Sotomayor, C.J.) ("[W]e must

consider any specific expressions of legislative intent in the statute itself as well as the legislative history[.]").

Plaintiff contends that the RBA is regulatory because (i) the text of the RBA and its legislative history evidence a motivation to advance distinct policy goals; and (ii) it serves no proprietary purpose. (Pl. Br. 13-16; Pl. Reply 5-7; Pl. Opp. 8-14). Defendants, in turn, argue that the RBA is *not* regulatory because (i) the bulk of the RBA serves a purely informational purpose; (ii) alternatively, it furthers the City's proprietary interests; (iii) the decision of whether to designate or de-designate banks is vested in an independent administrative body (i.e., the Banking Commission); and (iv) it sets forth no compulsory requirements for banks. (Def. Br. 14-21; Def. Opp. 9-22; Def. Reply 2-17). With respect to this last argument, Plaintiff counters that the RBA, even with its voluntary reporting requirement, indirectly regulates banks through coercing them to spend hundreds of hours complying with RFIs and wielding threat of reputational harm and de-designation as consequences for non-compliance. (Pl. Reply 8-12; Pl. Opp. 14-19). Having considered each of these arguments, the Court agrees with Plaintiff: The RBA regulates banks.

### a.   The Objective Purpose of the RBA Is to Regulate Banks

On its face, the RBA is concerned with "assess[ing] the credit, financial and banking services needs throughout the City with a particular emphasis on low and moderate income individuals and communities." LL 38 sec. 1, subdiv. 1(a). Defendants suggest a variety of purposes for such an assessment, but only one appears on the face of the RBA: it "may be considered by the [Banking

Commission] in reviewing a bank's application for designation or redesignation as a [Deposit bank]." *Id.* at subdiv. 1(b).  The RBA thus unambiguously seeks to advance general societal goals and encourage a general policy.  *See BIECA*, 678 F.3d at 189; *Cardinal Towing*, 180 F.3d at 692.  These aims, however commendable, evince a regulatory purpose.

What is obvious from the text is confirmed by the legislative history.  The legislators who sponsored and who spoke in support of this bill did so with one voice: federal and state laws were seen as ineffectual in terms of both the collection of information and the influence over bank conduct regarding community reinvestment in New York City.  Legislators enacted the RBA to counteract these perceived failures of federal and state law, by "encouraging" banks to modify loans, increase lending, and provide more products and services to certain underserved or poorly-served segments of the population.  Indeed, as detailed in the Facts section, a certain regulatory braggadocio permeates the legislative history of the RBA.  (*See, e.g.*, Pl. 56.1 ¶ 19 ("We're trying to be creative and finding ways that we could bring banks to the table, bring them out to the forefront to say now it's time to start modifying these loans, stop playing games, let's help those people that want to be helped, that could be helped, and we're trying to be creative."); *id.* at ¶ 36 ("The City Council is no longer going to sit back and let banks get[] millions of dollars in deposits and let the Banking Commission just sit back and do nothing."); *id.* at ¶ 52 (explaining the need for the RBA and noting that "state and federal CRA ratings actually provide very little meaningful information regarding a bank's

48

community level of services"); *id.* at ¶ 59 (articulating the goal of the RBA to "encourage the banks that receive city deposits to become more responsive[,] more accountable," and "more responsible to the city and to our communities within the city"); *id.* at ¶ 69 ("This bill is going to … allow us to actually create a benchmark, if you will, for what is the state of banking in our neighborhoods and what do we need to improve it.  It is an incredibly important piece of legislation to make sure that community voices are part of the banking process."); *id.* at ¶ 70 ("[The bill] really enacts the strongest local community reinvestment law in the nation.")).  In the face of this evidence, Defendants are left to argue that each speaker "expresses only his [or her] opinion on the power of [the RBA]."  (*See, e.g.*, Def. 56.1 Response ¶ 70).  Even were that true, the Court cannot overlook the absence of any contemporaneous evidence — indeed, any legislative history — espousing a permissible, non-regulatory purpose behind the RBA.

Defendants' incantation of "transparency," as an end in and of itself, does not pass muster.  (*See* Def. 56.1 Response ¶ 64; Pl. 56.1 ¶ 70).  The gathering of information may be necessary to the RBA, but it does not delimit the RBA.  By targeting only Deposit Banks — and not other financial institutions — the RBA places its premium on leverage to advance policy objectives rather than on information *qua* information.  It is not lost on the Court that the RFIs were addressed to individuals responsible for maintaining each Deposit Bank's depository status with the City, rather than individuals charged with gathering Federal CRA information.  (*See* Pl. 56.1 ¶ 165; Aug. 5

49

Tr. 31-32 ("[T]he city had coercive power over deposit banks, and that's why they targeted deposit banks....  The gathering of the information depends on how you gather the information....  [L]o and behold, on May 13 letters went out, and those letters were directed to the person at the bank responsible for the relationship at the deposit level between the city and the bank.  And that's a fact that's not disputed in the record.")).  Such an approach, while understandable from a regulatory standpoint, undercuts any suggestion that the RBA is aimed primarily at information-gathering.  Coupled with the RBA's express procedures for adjudging, ranking, and publishing banks' efforts to comply with its subjective criteria codified therein, the argument that the RBA's primary goal is "transparency" or purely "informational" rings hollow.

Along these same lines, the City's argument that the RBA serves distinct, non-regulatory "planning and policymaking purposes" (Def. Reply 3; *see also* Def. Br. 31 (referring to the RBA's "research and analysis scheme")), is difficult to credit.  To begin with, the Court perceives no difference between an ostensibly permissible "policymaking" purpose and an impermissible "regulatory" purpose.  These terms are used interchangeably in common parlance and in preemption case law.  *See Boston Harbor*, 507 U.S. at 229 ("[A] State may act without offending ... pre-emption principles ... when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking." (internal quotation marks omitted)); *Mayor of City of N.Y.* v. *Council of City of N.Y.* ("*Mayor of N.Y.C.*"), 780 N.Y.S.2d 266, 270 (N.Y. Sup. Ct. 2004) ("Local Law 36 sets policy.").  With respect to the "planning" goal of the

50

RBA — to the extent this is not simply a euphemism for further regulation —
the legislative history of the RBA and the spirited debate that ushered it into
law belie a purpose so toothless.

Defendants argue that Plaintiff has cast an unreliable account of the
legislative history, primarily because the legislative history it cites includes
comments made by legislators before the bill was drafted.  (Def. Reply 9).  To
the extent Defendants believe comments made by Chairman Recchia and
Chairman Vann during the November 23 Hearing "shed no light whatsoever" on
the issue of legislative intent, they are incorrect.  The comments of Chairman
Recchia and Chairman Vann during the November 23 Hearing were consistent
with comments they made thereafter, and are particularly relevant because
these legislators served as co-sponsors of the bill that would become the RBA.
Indeed, it is Defendants' argument that the legislative history "unequivocally"
demonstrates that the RBA is not regulatory that beggars belief.  (*Id.* at 9).
Numerous individuals with experience in municipal finance and community
reinvestment testified at length regarding their concerns with the RBA's
*regulatory* aims.  (*See* Pl. 56.1 ¶ 27 ("[W]e are concerned that the bill may lead
to confusion among consumers and businesses who may believe that the [DOF]
is regulating banks and assessing their performance, when in fact banks are
regulated by federal and state authorities with respect to the matters covered
by the criteria found in [the RBA]."); *id.* at ¶ 42 (advocating reliance on federal
"CRA ratings, [which would] allow[] the city to increase accountability for banks
without … increasing the regulatory burden on banks"); *id.* at ¶ 60 ("This bill

51

effectively anoints the [DOF] a banking regulator.")).  If anything, it is
Defendants' cherry-picking of self-serving and conclusory statements made by
the bill's sponsors after the specter of preemption was raised (*see, e.g.*, Def.
Reply 9 ("Let me be clear: this is not a regulatory bill.")), that paints the
inaccurate picture.  In sum, the Court finds that the text of the RBA and its
legislative history manifest an objective purpose to regulate banks.

### b.    The RBA Does Not Serve a Proprietary Purpose

The Court's finding that the RBA's primary purpose is to regulate banks
leads *a fortiori* to the conclusion that its primary purpose is not "proprietary."
This conclusion is further borne out by the undisputed facts.  Nowhere in the
text of the RBA or the legislative history cited by the parties is there even a
suggestion that the City's role as proprietor drove this law.

Defendants argue for a broad interpretation of a municipality's
proprietary function, relying primarily on the Second Circuit's decision in
*Sprint Spectrum L.P.* v. *Mills*, 283 F.3d 404 (2d Cir. 2002).  Specifically,
Defendants argue that *Sprint Spectrum* demonstrates that a municipal actor's
"concerns for the health and safety" of its constituents can constitute a
permissible proprietary purpose.  (Def. Br. 21 (quoting *Sprint Spectrum*, 283
F.3d at 410)).  A review of that case, however, makes clear that Defendants'
reliance is misplaced.  The school district in *Sprint Spectrum* "entered into a
single lease agreement with respect to a single building" to allow a private
company to place a cellular tower on school property.  283 F.3d at 420.  As
part of the agreement, the school district placed restrictions on the radio

frequency emissions that the cellular tower could emit.  *Id.*  Although the
school district placed these conditions on this single lease, it "did not purport
to punish [the lessee] for any past conduct or to impose any condition with
respect to" other lease agreements.  *Id.* at 420-21.  Calling this activity "plainly
proprietary," *id.* at 420, the Second Circuit would not infer that the school
district "sought to establish a[] general municipal policy," *id.* at 421.

     The critical distinction here is that Defendants are not attempting to
place conditions on deposits or transactions that *the City* makes as a bank
customer — i.e., as proprietor — when "interact[ing] with private participants
in the marketplace."  *Sprint Spectrum*, 283 F.3d at 417 (quoting *Boston Harbor*,
507 U.S. at 227).  Instead, Defendants purport to place conditions on (or at
least set forth criteria for) transactions taking place among other private
participants dealing in financial markets far afield from municipal deposit-
taking.  *See BIECA*, 678 F.3d at 189 n.2 ("[I]f [the contract] governs …
unrelated matters to which the state might not even be a party," this
"[e]xtracontractual effect is an indicator of regulatory rather than proprietary
intent[.]").  The difference can be illustrated by imagining that the school
district in *Sprint Spectrum* had attempted to regulate the emissions emanating
from cellular towers placed on property owned by *its constituents* — that is,
teachers, parents, and students.  Such activity would no longer be "plainly
proprietary"; instead, it would be "tantamount to regulation."  *Wisc. Dep't of
Indus., Labor & Human Relations* v. *Gould Inc.*, 475 U.S. 282, 289 (1986).

That the RBA does not emanate from the City's proprietary concerns is brought into sharper relief when one considers that the RBA will cost the City more than $500,000 per year, but will yield the City — as banking customer — no discernable financial benefits.  *See Mayor of N.Y.C.*, 780 N.Y.S.2d at 270 ("The City Council explains its interest as economic…. Defendants, however, have not demonstrated that the City, rather than individual borrowers, would benefit financially[.]").[8]

In addition, Plaintiff is correct that the City here does not remotely resemble a "typical market consumer."  (Pl. Opp. 12).  A typical consumer does not hold public hearings, collect and compile an enormous amount of information directly from banks, and then publish its own comprehensive rating system.  *Metro. Taxicab Bd. of Trade* v. *City of New York*, No. 08 Civ. 7837 (PAC), 2008 WL 4866021, at *11 (S.D.N.Y. Oct. 31, 2008) ("[T]he process the City followed in promulgating the [challenged] Rules belies any claim that the City is acting as a proprietor rather than a regulator.  The City published notice of its intent to adopt new rules in the City Record, took public comments, and then adopted the new rules.  It even held additional public hearings.  This is not the kind of conduct the City engages in when it purchases vehicles for its own use.").  Simply put, the RBA seeks to harness

---

[8]    To the extent the City could claim an indirect financial benefit inuring from community reinvestment efforts, the Court notes that the City Council conceded in connection with *N.Y. Bankers* that it "did not consider the potential economic growth and enhanced community development and stability that may result from implementation of [the RBA], nor did it consider the potential monetary savings to the City of such growth, development, and stability."  (Pl. Opp. 11 (citation omitted)).

the City's power in the marketplace to leverage its own policy goals.  This it

may not do.  *See Council of City of N.Y.*, 6 N.Y.3d at 395 ("[A] state may [not]

escape the force of federal preemption by using its power in the marketplace to

implement governmental policies.  To the contrary, … a state acts as a

regulator, not a proprietor, when it uses its bargaining leverage as a means of

attaining policy ends." (citing *Boston Harbor*)).[9]

### c.    The RBA Regulates Bank Conduct

Defendants contend — reviving arguments made by early proponents of

the RBA — that the RBA *requires* nothing of banks, and therefore cannot

regulate conduct.  (*See* Def. Br. 15).  They further argue that since the Banking

Commission "may," but is not "required to," consider the CIAB's report when

designating or de-designating Deposit Banks, the RBA does evoke any

regulatory power.  (*Id.* at 16-19).

Plaintiff counters that the RBA's threat of branding non-compliant banks

that do not produce information, and potentially withdrawing their depository

status, brings to bear a cognizable and coercive force on Deposit Banks.  (Pl.

Opp. 14-19).  The RBA, it argues, will force the Deposit Banks to expend

---

[9]    In arguing that the RBA furthers an already existing "proprietary" interest, Defendants
note that pre-existing local regulations permit the Banking Commission to consider "a
bank's CRA report and CRA rating" in making designation decisions.  (Def. Opp. 18
(citing R.C.N.Y. § 1-03(c)(3)).  They argue that that "[t]he City cannot be preempted from
considering information that federal and state banking laws make publicly available
merely because it has been further analyzed."  (*Id.*).  This argument fails for three
reasons.  First, the Banking Commission's use of Federal CRA reports and ratings is not
subject to challenge here.  Second, for the reasons already stated, the Court does not
agree that, to the extent the Banking Commission uses these ratings, it does so for a
"proprietary" purpose.  And finally, the Banking Commission's analysis of *Federal* CRA
reports and ratings does not implicate preemption concerns.

significant resources complying with a third wave of regulatory data production requests regarding community reinvestment efforts.  Moreover, Plaintiff argues that the RBA, by requiring production of "census tract"-level detail, far exceeds the burden imposed by the Federal CRA and its state-law analogue.  (*See* Pl. Br. 20-22).

Before addressing these arguments, the Court observes that the focus of the inquiry at this stage — i.e., determining whether a law is "regulatory" — is generally "centered on regulatory *purpose* rather than effect."  *BIECA*, 678 F.3d at 190 (emphasis in original).  *Cf.* Discussion Sec. B(2) (explaining that *both* purpose and effect are relevant to whether local regulation in a given field so interferes with federal regulation as to be deemed preempted by the federal statute).  Nevertheless, the Court will address these arguments because "manifest purpose and inevitable effect," *Gould*, 475 U.S. at 291, are somewhat difficult to disentangle here.

Plaintiff has the better of these arguments for several reasons.  First, the RBA's very structure secures compliance through public shaming of banks and/or threatening to withdraw deposits from banks that do not provide information to the CIAB.  The Court sees no reason why regulation through coercive power, rather than by explicit demand or stricture, should be immune from preemption scrutiny.  *See N.Y. News, Inc.* v. *State of N.Y.*, 745 F. Supp. 165, 171 (S.D.N.Y. 1990) ("Because of the coercive and pervasive effect the Board will have … we find … that the establishment of a board of inquiry under the circumstances such as these is preempted."); *id.* at 172 ("Its powers are

56

inherently coercive, and were intended to be so, and its report will inevitably,

and is intended to, force the parties to reach a particular agreement, in

accordance with the public pressure generated by the Board's report and

recommendations."); *Cab Operating Corp.* v. *City of New York*, 243 F. Supp.

550, 558 (S.D.N.Y. 1965) (comparing "[a] mere informal poll of employees by a

private party" to "a formal election sponsored and conducted by public officials

under governmental aegis and expected to exert the coercive pressure of public

opinion"); *Skilled Craftsmen of Tex., Inc.* v. *Tex. Workers' Comp. Comm'n*, 158

S.W.3d 89, 95 (Tex. App. 2005) ("It appears clear that the disparaging

label … is designed to make an example out of an employer in order to coerce a

change in the conduct of [those] who wish to avoid such a stigma.").[10]

---

[10]   During oral argument, counsel for Defendants attempted to distinguish federal preemption cases in the labor context. (Aug. 5 Tr. 54 ("Even though I concede that banking law preemption is broad, NLRA [the National Labor Relations Act] is different.")). The Court is not persuaded. "National banking is the paradigmatic example" of a field in which state laws are preempted. *Clearing House*, 557 U.S. at 554 (Thomas, J., concurring in part and dissenting in part). There is no categorical reason why a court should ignore preemption case law interpreting the NLRA, and Defendants point to no specific reason why the logic from this body of cases cannot be applied here.

In contrast, there are good reasons why the Court may accord less weight to Defendants' argument that "[o]nly where the local measure deprives private actors of any meaningful economic choice can it arguably be deemed sufficiently coercive as to be regulatory." (Def. Opp. 22). To begin with, the Court disagrees with Defendants' interpretation of preemption case law addressing the effect of economic incentives. In *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Insurance Co.*, the Supreme Court "acknowledge[d] that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA [Employee Retirement Income Security Act of 1974] plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted[.]" 514 U.S. 645, 668 (1995). The Court is not, therefore, persuaded of the categorical assertion that "laws … seek[ing] to influence market behavior in preempted areas are not regulatory so long as they leave economically-viable choices." (Def. Opp. 21). Moreover, as the *Travelers Insurance* Court emphasized, ERISA preempts only those state laws that "relate to an[] employee benefit plan," and "nothing in the language of the Act or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." 514 U.S. at 651, 661 (quoting 29 U.S.C. § 1144(a)).

Second, the Banking Commission's discretion when considering the CIAB Report, and when exercising its designation power, is largely irrelevant to the issue of whether the RBA is regulatory.  A legislature's grant of discretion in the enforcement of laws is unremarkable; it is, in most circumstances, presumed. *See United Airlines, Inc.* v. *Brien*, 588 F.3d 158, 174 (2d Cir. 2009) ("Unless a statute constrains an agency's exercise of its enforcement powers, the agency possesses broad discretion in how it enforces statutory and regulatory law."); *Consol. Edison Co. of N.Y.* v. *Dep't of Envtl. Conservation*, 71 N.Y.2d 186, 191 (1988) ("It is sufficient if the Legislature confers broad power upon the agency to fulfill the policy goals embodied in the statute, leaving it up to the agency itself to promulgate the necessary regulatory details[.]").  As Plaintiff points out, under Defendants' view of what qualifies as "regulatory," even the Federal CRA would not qualify, because it does not *require* federal regulators to penalize banks for poor ratings.  (*See* Pl. Reply 9 (citing 12 U.S.C. § 2903(a))).  This absurd outcome underscores the scant attention that should be paid to discretion as a sign of whether a particular law is regulatory.  After all, under Defendants' theory, local legislatures could immunize legislation that otherwise would be preempted simply by changing the words "shall" and "must" to "may."

The Court also agrees with Plaintiff that because two of the three Banking Commission members sit on the CIAB, the theoretical possibility that the Banking Commission *may* not adhere to the CIAB's rankings when

---

Unlike the NLRA, for example, ERISA's preemptive scope is significantly narrower than the preemptive scope of federal banking law.  *See Pac. Capital*, 542 F.3d at 351.

choosing Deposit Banks is unlikely to be borne out in practice.  But that is beside the point.  The RBA authorizes the Banking Commission to consider its rankings; it encourages this by requiring the CIAB to send the Banking Commission its Annual Report; and its *raison d'être* depends on the Banking Commission taking its findings into account.  A law need not remove all discretion from an agency's hands to be considered regulatory.  *See Mayor of N.Y.C.*, 780 N.Y.S.2d at 276 (finding local law preempted where "the City *could impose* various penalties" (emphasis added)), *abrogating* Local Law 36 sec. 2(e)(1) (2002) ("The comptroller may, *in his or her discretion*, recommend that city moneys or funds not be invested or permitted to remain invested in the stocks, securities or other obligations of any financial institution that is a predatory lender or of an affiliate of a predatory lender." (emphasis added)).[11] Accordingly, Defendants' arguments fail to controvert the text and legislative history of the RBA, both of which demonstrate a regulatory purpose.

---

[11]    Defendants also argue that the Court cannot know whether the Banking Commission will actually take into account the CIAB's ranking until the Banking Commission is faced with exercising its designation power in a post-RBA world.  (Def. Opp. 8 n.1).  This argument, which sounds in ripeness, lacks any traction given the procedural history of the *N.Y. Bankers* case, the arguments made by the City Council therein, and the events that have transpired in the interim.  The City Council previously argued that the events that Plaintiff feared would happen were too speculative.  Specifically, it argued that, despite the RBA's mandate, the CIAB might never convene, and that the CIAB might not request information from Deposit Banks.  But those events, and others triggered by the current administration's enforcement of the RBA, have since happened.  Deposit Banks are put to the choice of whether to comply, and incur costs immediately, or face the consequences of non-compliance.  This case is ripe.

## 2.   The RBA Is Preempted Because It Conflicts with Federal Law

Because the Court has found the RBA to be regulatory, it must address whether it is preempted by federal or state law.

"[C]onflict pre-emption, which is at issue here, occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective[s] of Congress." *Pac. Capital,* 542 F.3d at 351 (internal citations and quotation marks omitted).  "State law is in 'irreconcilable conflict' with federal law, and hence preempted by federal law, when compliance with the state statute would frustrate the purposes of the federal scheme." *Id.* (quoting *Rice* v. *Norman Williams Co.*, 458 U.S. 654, 659 (1982)).[12]

To determine whether a local law is preempted by federal law, the Court must look to legislative history and intent.  *See Entergy Nuclear*, 733 F.3d at 419 ("We therefore believe that legislative history is an important source for

---

[12]   Conflict preemption is ordinarily understood as preventing "'conflicts' that prevent or frustrate the accomplishment of a federal objective and 'conflicts' that make it "impossible" for private parties to comply with both state and federal law."  *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000).  The Court has difficulty identifying a specific requirement of the RBA with which it would be impossible for Deposit Banks to comply while remaining simultaneously compliant with federal law.  Rather, the OCC's regulations express the intent to strike the appropriate balance of regulation without being frustrated by the imposition of additional regulatory burdens by other actors.  The effect of these regulations is to blur the line between conflict preemption and field preemption, since any additional regulation in the field is held to frustrate the accomplishment of the federal objective.  The Court accepts the resulting mild doctrinal ambiguity; the Supreme Court has acknowledged that the different categories of preemption are not "rigidly distinct.  Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990); *accord Niagara Mohawk Power Corp.* v. *Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 95 (2d Cir. 2012).

determining whether a particular statute was motivated by an impermissible
motive in the preemption context.").  That said, courts have "refused to rely
solely on the legislature's professed purpose and have looked as well to the
effects of the law."  *Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105
(1992); *see also Vango Media, Inc.* v. *City of New York*, 34 F.3d 68, 73 (2d Cir.
1994) ("[T]he question of preemption is defined, in part, by the purpose of the
state law, and, in part, by the state law's actual effect.  Both must be
considered in answering the question whether state regulation in a given field
so interferes with federal regulation as to be deemed preempted by the federal
statute." (citing *Gade,* 505 U.S. at 103-06) (internal citations omitted)).

Plaintiff first contends that the RBA is preempted by the NBA,
specifically, that the RBA improperly grants the CIAB visitorial powers, powers
that are exclusively reserved for the federal government.  (Pl. Br. 16-18).  "[A]
national bank ... is an 'instrumentalit[y] of the Federal government, created for
a public purpose, and as such necessarily subject to the paramount authority
of the United States.'"  *Pac. Capital*, 542 F.3d at 351 (quoting *Marquette Nat.
Bank of Minneapolis* v. *First of Omaha Serv. Corp.,* 439 U.S. 299, 308 (1978)).
Accordingly, "the States can exercise no control over [national banks], *nor in
any wise affect their operation,* except in so far as Congress may see proper to
permit."  *Id.* (quoting *Watters* v. *Wachovia Bank, N.A.,* 550 U.S. 1, 11 (2007)
(emphasis in *Pac. Capital*)).

The congressional intent in this instance is clear.  Section 484(a) of Title
12 of the United States Code, a provision of the NBA, reads as follows:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

Visitorial powers are defined as (i) examination of a bank; (ii) inspection of a bank's books and records; (iii) regulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) enforcing compliance with any applicable federal or state laws concerning those activities.  12 C.F.R. § 7.4000.

The Supreme Court has described these powers as follows:

> "Visitorial powers" in the National Bank Act refers to a sovereign's supervisory powers over corporations.  They include any form of administrative oversight that allows a sovereign to inspect books and records on demand, even if the process is mediated by a court through prerogative writs or similar means.  The Comptroller reasonably interpreted this statutory term to include "conducting examinations [and] inspecting or requiring the production of books or records of national banks," § 7.4000, when the State conducts those activities in its capacity as supervisor of corporations.

*Clearing House*, 557 U.S. at 535-36 (majority opinion); *see also Watters*, 550 U.S. at 11 ("Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or purposes of the NBA.").

Plaintiff's argument is based upon its contention that the RBA's authorization of data and information collection constitute the "quintessential example" of a demand for books and records.  (Pl. Br. 16-17).  Plaintiff also

notes that the Needs Assessment specifically refers to an "examination" of Deposit Banks.  (*Id.* at 17).  The City responds that the CIAB's RFI "could similarly be made by letter from a public official, by a journalist, or by a member of the public," and therefore that "[i]t carries no visitorial power."  (Def. Opp. 25).

To begin with, the Court agrees with Plaintiff that examination of a bank's books and records is not limited to on-site visitation.  (*See* Pl. Br. 17) Embracing such a staid concept of visitorial powers would ignore modern technology, pervasive use of RFIs as a supervisory tool for regulators at the federal and state level, and federal regulations that specifically extend visitorial powers to include "the *production* of books or records of national banks."  12 C.F.R. § 7.4000(a)(1) (emphasis supplied).  Defendants do not contest this. They simply argue that the RBA, and the RFIs issued pursuant to the RBA, do not "require" Deposit Banks to provide information.  (Def. Opp. 24).

The critical question is whether RFIs issued pursuant to the RBA are sufficiently backed by an "implicit … threat that if the request [is] not voluntarily honored, that other action [will] be taken."  *Clearing House*, 557 U.S. at 536.  They are.  Certainly, the threat of an executive subpoena (as in *Clearing House*) is substantively different from the threat of reputational injury through public shaming or de-designation, primarily in terms of the type of governmental power involved.  But this distinction makes little difference.  The Court is persuaded that this particular local law is preempted because it entails an "examination of a bank's books and records" for the purpose of

determining whether a national bank fits within an "independent code of lender conduct." *Mayor of N.Y.C.*, 780 N.Y.S.2d at 272.  The *Clearing House* Court's reference to examinations of books and records made "on demand" is no barrier to this result.  Again, a review of the legislative history, as well as the text of the law as a whole, compels a finding that RFIs issued pursuant to the RBA are demands.  Accompanied by all indicia of regulatory power, and stamped with the imprimatur of a governmental agency, they effectively (and by design) hold hostage a bank's reputation and deposit bank status in exchange for information.[13]

Plaintiff next argues that the RBA is preempted by federal law because it seeks to regulate or influence national banks' core banking activities.  (Pl. Br. 18-19).  It contends that the RBA was enacted specifically to influence banks' behavior, and that federal law, including regulations promulgated by

---

[13]    The Court will briefly address the argument by the ANHD *amici* that "given the historically low reputation already enjoyed by many NYBA member banks, it strains credulity that either a failure to provide a category of information to the CIAB, or alternatively, the inclusion of such information in the CIAB's reports, could subject these banks to additional public shaming."  (ANHD Br. 22).  There is no need for the Court to take a position on the reputation of the large financial institutions *amici* list on pages 22 through 26 in their brief.  The Court will simply note, as Plaintiff does, that so-called "community banks" also serve as Deposit Banks, and are subject to the RBA's requirements.  (Pl. Opp. 19).  Representatives from some of these banks have submitted sworn declarations, indicating that, in order to "maintain strong relationships with [their] customers and counterparties," they "rel[y] on [their] reputation for providing high-quality banking services, including to underserved communities."  (*E.g.*, Dkt. #25 (Decl. of Flushing Bank) ¶ 13; *see also* Aug. 5. Tr. 30 ("[T]here are undisputed declarations put before the Court that community lending is an important part of their business model.")).  *See also* Amendments to the 2013 Mortgage Rules under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 79 Fed. Reg. 74176-01 ("[C]ommunity banks and credit unions … generally maintain a 'relationship' model that depends on repeat business and are particularly vulnerable to reputational harm from a failure to treat customers well.").

64

the Office of the Comptroller of the Currency (the "OCC"), occupies this precise

space.  (*Id.* at 18 ("OCC regulations provide that 'national bank[s] may make

real estate loans … *without regard to* [certain] *state* law limitations.'" (quoting

12 C.F.R. § 34.4) (emphasis added)); *id.* ("OCC regulations explicitly provide

that national banks 'may receive deposits and engage in any activity incidental

to receiving deposits without regard to [certain] state law limitations.'" (quoting

12 C.F.R. § 7.4007))).  In a similar vein, Plaintiff argues that the RBA conflicts

with the CRA because its burdens are greater, it focuses on data at a census

tract level, and it employs a public shaming and de-designation protocol for

non-compliant banks.  (Pl. Br. 20-23).  Because "federal control shields

national banking from [such] unduly burdensome and duplicative state

regulation," Plaintiff argues that the RBA is preempted.  (*Id.* at 16 (quoting

*Watters*, 550 U.S. at 11)).[14]  The Court agrees.

Plaintiff's argument is supported by both the legislative history and the

text of the statute.  The Council was dissatisfied with, *inter alia*, Deposit Banks'

---

[14]     One argument advanced by Plaintiff that the Court cannot fully credit on this record is
that the RBA's treatment of confidential and proprietary information implicates
preemption concerns.  (Pl. Br. 20).  In theory, information that the OCC considers
sacrosanct — so called, confidential supervisory information ("CSI") — would fall within
Section 1, Subdivision 3(h) of the RBA, and would be shielded from public disclosure.
*See* LL 38 sec. 1, subdiv. 4.  Although the Court recognizes that the OCC may have a
broader estimation of what CSI entails than the CIAB, the Court is not persuaded a
conflict exists based on the face of the RBA, and its treatment of confidential
information.  Additionally, the Court is not convinced by *amici* that the RBA's treatment
of confidential information conflicts with the Federal CRA's provisions on similar
information.  (*See* ABA Br. 12).  The CRA allows a federal agency to shield from
publication information that "*in the judgment of the agency*, is too sensitive or
speculative to disclose."  (*Id.* (quoting 12 U.S.C. § 2906(c)(2) (emphasis added)).  The
Court cannot make the leap that *amici* do that a federal agency's conception of
information that is too sensitive to disclose is necessarily coextensive with an individual
bank's conception of confidential and proprietary information.

lending to certain low- and moderate-income communities; it therefore included a provision targeted to address that concern in the RBA.  The RBA empowers the CIAB to (i) publish benchmarks and best practices; (ii) collect information from banks regarding their efforts to achieve those benchmarks and best practices; (iii) evaluate whether those efforts are sufficient; (iv) include that finding in its ratings of those banks; and (v) make information and ratings public.  The Banking Commission may then use these ratings in its decision to de-designate a bank.  This regime conflicts with federal regulations and the Federal CRA, which provide national banks with more circumscribed directives; therefore, the Court concludes that the RBA stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Barnett Bank*, 517 U.S. at 31 (citation omitted).  Accordingly, it is preempted by federal law.

### 3.    The RBA Is Preempted by New York State Law

Members of the NYBA also include state-chartered banks.  Accordingly, Plaintiff contends that the RBA is preempted by the NYBL (the "NYBL"), since the State intends exclusively to occupy the field for state-chartered banks.  As noted previously, under New York law, preemption occurs where "the State has evidenced its intent to occupy the field," *Albany Area Builders Ass'n*, 74 N.Y.2d at 377, or there is otherwise a "conflict between local and State law," *Cohen*, 100 N.Y.2d at 400 (quotation omitted).  *Accord Eric M. Berman, P.C.* v. *City of New York*, — F.3d —, No. 13-598-cv, 2015 WL 4635778, at *3 (2d Cir. Aug. 5, 2015) (finding "no express conflict between the broad authority accorded to

[New York State] courts to regulate attorneys under the [New York] Judiciary Law and the licensing of individuals as attorneys who are engaged in debt collection activity falling outside of the practice of law," and further finding that the "authority to regulate attorney conduct does not evince an intent to preempt the field of regulating nonlegal services rendered by attorneys" (quoting *Eric M. Berman, P.C.* v. *City of New York*, — N.Y.3d —, No. 114, 2015 N.Y. Slip Op. 05594, at *5 (2015)) (internal quotation marks omitted)).

The NYBL provides that it is "the policy of the state of New York that the business of all [state-chartered] banking organizations shall be supervised and regulated through the department of financial services" (the "DFS"). N.Y. Banking Law § 10. "The Superintendent of [the DFS] and [the DFS] have broad powers of regulation to control and police the banking institutions under their supervision." *N.Y. State Bankers Ass'n* v. *Albright*, 38 N.Y.2d 430, 440 (1975). On this basis, Plaintiff argues, New York has evinced its intention to occupy the field of banking regulation for state-chartered institutions. (Pl. Br. 23). Defendants argue that the RBA is not preempted by the NYBL "for all of the reasons shown … that the RBA is not preempted by" federal law. (Def. Opp. 28). Here, too, Plaintiff is correct. As the NYBL "evince[s] an intent to preempt the field of regulating" state-chartered banks, *Eric M. Berman*, 2015 N.Y. Slip Op. 05594, at *5, the Court concludes that the RBA is preempted by New York State law.

### 4.     The Court Will Not Sever Provisions of the RBA

Finally, the Court must address Defendants' argument that, "[i]f the Court concludes that the RBA regulates the [Deposit Banks]," it should sever the RBA provisions that: (i) permit the public identification of non-compliant banks; and (ii) allow the Banking Commission to consider the CIAB Report in making Deposit Bank designations.  (Def. Opp. 32).  Defendants argue that severance of the "purportedly coercive provisions" would leave the "legislative scheme largely intact" (Def. Br. 31), and do no violence to the "RBA's research, analysis, and reportage scheme" (Def. Opp. 32).

"Severability is a question of state law[.]"  *Concerned Home Care Providers, Inc.* v. *Cuomo*, 783 F.3d 77, 88 (2d Cir. 2015).  In the absence of a severance clause — an absence the parties concede (*see* Def. Br. 31; Pl. Opp. 30) — Defendants bear the "burden [of] show[ing] that the unconstitutional provisions are severable."  *Nat'l Adver. Co.* v. *Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990).

The parties recite the standard for severability in two subtly different ways.  The first iteration of the standard would, as Plaintiff advocates, consider the "[t]he critical issue … whether the [RBA] *would have been enacted* if it had not included the unconstitutional provisions."  *Town of Babylon*, 900 F.2d at 557 (emphasis added).  The second version of the standard, which Defendants advocate, would focus "on whether the Legislature *would have wished the [RBA] to be enforced* with the invalid part exscinded, or rejected altogether."  *Concerned Home Care Providers*, 783 F.3d at 88 (internal quotation marks and

68

citation omitted) (emphasis added).  The latter more accurately states the inquiry under New York law.  *See People* v. *On Sight Mobile Opticians*, 24 N.Y.3d 1107, 1109 (2014).  Regardless, these inquiries, while certainly different, result in the same answer here: The provisions cannot be severed.

Defendants argue that a neutered, toothless RBA can still serve salutary (and constitutionally inoffensive) purposes.  (Def. Br 31-32).  However true this may be, it "is not relevant to the issue of whether [the City Council] *would have enacted* the [RBA] in the manner proposed[.]"  *Town of Babylon*, 900 F.2d at 557 (emphasis added).  A review of the legislative history makes clear that the City Council would not have passed a version of this bill that omitted these provisions.  Rather, the provisions Defendants urge the Court to sever were the subject of serious debate, and many voices in opposition informed the Council of their concerns regarding preemption.  In vetoing the legislation, Mayor Bloomberg opined that the RBA "impermissibly use[d] the City's power to designate banks" and "pressure[d] banks into adopting certain practices with respect to core banking matters."  (Pl. 56.1 ¶ 67).  This message, which applies most directly to the two provisions Defendants seek here to sever, was heard — and rejected by — the City Council.  A clear window into what the legislature *would have* done is usually unavailable.  Not so here.  In overriding the Mayor's veto, the City Council made plain that it passed the precise bill it intended to.  Accordingly, if the Court were to follow the standard as articulated in *Town of Babylon*, these provisions could not be severed.

With respect to the second iteration of the severability standard, as most recently articulated by the Second Circuit in *Concerned Home Care Providers*, the Court must ask whether the legislature would have wished the RBA to be enforced with the invalid part excised.  783 F.3d at 88.  "The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch, instead of at the roots."  *People ex rel. Alpha Portland Cement Co.* v. *Knapp*, 230 N.Y. 48, 60 (1920) (Cardozo, J.); *accord Anonymous* v. *City of Rochester*, 13 N.Y.3d 35, 53 (2009).

Defendants have failed to meet their burden of showing severability under this standard.  They argue that the RBA should survive, with coercive branches pruned, so that the CIAB can "retain all of its functions to assess community credit and banking needs and report on whether those needs are being met." (Def. Br. 31).  The Court is not persuaded.  The RBA costs the City more than $500,000 a year.  In return, the RBA was to encourage certain behavior on the part of the banks.  (*See* Pl. 56.1 ¶ 59 ("[The RBA will] encourage the banks that receive city deposits to become more responsive and more accountable to New York City communities."); *id.* at ¶ 64 ("Today we are taking an affirmative step to ensure, encourage and support responsible banking in our city."); *id.* at ¶ 70 ("This override which you are about to do ..., it really enacts the strongest local community reinvestment law in the nation. Th[e] [RBA] emphasizes transparency and encourages community reinvestment."); *id.* at ¶ 127 ("[The RBA] encourage[s] banks seeking to hold

70

city deposits to be more accountable to low- and moderate-income New Yorkers.")).  The RBA's power to do so has been eviscerated, and with it too the Court's confidence that the legislature would have found the game worth the candle.

## CONCLUSION

The RBA is preempted by federal and state law.  Its unconstitutional provisions cannot be severed.  As a result, the RBA is void in its entirety.  Plaintiff's motion for summary judgment is GRANTED.  Plaintiff's motion for a preliminary injunction and Defendants' motion to dismiss the Complaint are DENIED AS MOOT.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     August 7, 2015
           New York, New York

                                    _____
                                    KATHERINE POLK FAILLA
                                    United States District Judge